**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| ALLAN SANDERS,<br><br>               Plaintiff,<br><br>vs.<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>               Defendant. | CASE NO. 4:20-CV-03023<br><br>**DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## I.　　INTRODUCTION

Allan Sanders ("Sanders") worked as a foreman general in the car department at Union Pacific Railroad Company ("Union Pacific").　In this job, Sanders had to perform dangerous tasks like inspecting and repairing rail cars that broke down on Union Pacific railways, which required working with electric and gas welding equipment, pneumatic tools, dollies, jacks, lifts, ATV's, overhead hoists, and cranes.　He had to climb on, around, and underneath railcars.　His job required significant physical strength and the ability to work outdoors in all weather conditions and temperature extremes.　Moreover, Sanders was on-call 24 hours per day, seven days a week and had to respond to emergency calls by himself in the event a train broke down.

In June 2018, Sanders was taken by ambulance to the emergency room and underwent surgery to repair a bleeding ulcer.　While in the hospital, Sanders suffered cardiac arrest and had to be resuscitated.　He was also diagnosed with acute kidney failure and chronic kidney disease.　Sanders informed Union Pacific of his hospitalization, and Union Pacific granted him a medical leave of absence ("MLOA").　Union Pacific also submitted Sanders for a fitness-for-duty ("FFD") evaluation to determine whether he could still safely perform his dangerous and strenuous job after his MLOA expired.

Union Pacific's Assistant Medical Director, Dr. John Charbonneau, oversaw Sander's FFD review. Dr. Charbonneau evaluated Sander's medical records. Though Dr. Charbonneau was able to resolve concerns with several of Sander's serious health conditions including his gastrointestinal bleeding, acute kidney failure, chronic kidney disease, alcohol abuse, and use of morphine, Sander's cardiac health remained a concern. As part of the FFD, Dr. Charbonneau requested that Sanders undergo a cardiac function test known as a Bruce protocol. Sanders performed very poorly on this protocol unable to continue the test even at a brisk walk due to fatigue. After reviewing the results of this test, Dr. Charbonneau determined that it was unsafe for Sanders to perform his job duties because of his extremely poor aerobic condition. However, Dr. Charbonneau told Sanders that if he could submit a satisfactory Bruce protocol score, he could return to his position. Sanders never underwent or performed another Bruce protocol assessment.

Sanders alleges that Union Pacific violated the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA") by: (1) intentionally discriminating against him on the basis of disability; (2) applying a policy that has an unlawful disparate impact based upon disability; (3) failing to grant a reasonable accommodation to Sanders; and (4) making an unlawful medical inquiry prohibited by the ADA. Sanders is unable as a matter of law to establish any of these claims. Sanders cannot establish his intentional discrimination claims because he offers nothing more than an expert, an occupational medical doctor, who claims Sanders can safely perform his job despite his extremely poor performance on the Bruce Protocol. But merely raising a medical dispute between experts about the

risk of future dangerous health episodes is not enough to establish a disparate treatment claim. Sanders is unable to prove a disparate impact claim because he has failed to identify any facially neutral employment policy that caused a disparate impact or screened him out because of his disability and he has offered no statistical evidence that is needed to support a disparate impact claim. Sanders admits that he never sought an accommodation from Union Pacific which is fatal to his reasonable accommodation claim. The record shows that Union Pacific's inquiry into Sander's medical condition was absolutely necessary after Sanders suffered a near life-ending medical event. Finally, Sanders posed a direct threat to the health and safety of himself and other individuals in the workplace. In sum, the record shows there is no dispute of material fact and Union Pacific is entitled to judgment as a matter of law on all of Sanders's claims.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

Union Pacific submits the following statement of undisputed material facts ("SOF") under Fed. R. Civ. P. 56 and NECivR 56.1(a) for its Motion for Summary Judgment only.

### A. Sander's Safety Sensitive Job at Union Pacific

1. Sanders began working for Union Pacific on May 1, 1979.[1] (Deposition of Allan Sanders ("Sanders Dep."), attached as Ex. A1, 18:21-19:2).

2. Sanders held various positions before becoming a foreman general in the car department in Parsons, Kansas, which the last position he held at Union Pacific. (Sanders Dep. at 19:3-14).

---

[1] Sanders started working for the Missouri, Kansas, and Texas Railroad or the "Katy Railroad", which eventually became part of Union Pacific.

3.     A Carman at Union Pacific is generally required to inspect and repair rail cars that break down on Union Pacific's railways.  (Carman Job Description, attached as [Ex. B1](Ex. B1)).

4.     Some of the specific job duties of a Carman include: (1) inspecting and repairing rail cars; (6) removing and replacing defective components on rail cars including trucks, shoes, coupler assemblies, and air brake systems; (7) working with shop machines and tools including, for example, electric and gas welding equipment, pneumatic tools, dollies, jacks, lifts and ATV's, overhead hoists and cranes.  (*Id.*)

5.     The Carman position also requires significant physical exertion in carrying out the job duties:

> **PERFORM PHYSICAL ACTIVITIES.**  Must be able to exert physical strength sufficient to lift/carry and push/pull objects weighing between 25 lbs (frequently) and 50 lbs often with assistance (occasionally).  May lift up to 86 lbs with assistance (rarely) using a cart to install knuckles.  May pull, push and position equipment on floor (occasionally).  May walk and stand (frequently).  May bend, stoop, kneel, and crawl as required when making repairs (occasionally).  Must be able to perform overhead work for short periods of time (occasionally).  Must be able to remain standing or sitting for more than one-half of every work day with opportunity periodically to change position for comfort.

(*Id.*).

6.     A Carman must also be able to perform in harsh outdoor work conditions:

> **WORK ENVIRONMENT**.  Work is frequently performed outdoors involving exposure to all weather conditions and temperature extremes.  Walking on ballast, ground and shop surfaces is required. . . . Must be able to climb and work at elevations more than 18 feet above ground level (rarely).

(*Id.*).

7.     As a foreman general, Sanders supervised Carmen but was also required to perform the Carmen duties. (Sanders Dep. at 29:7-30:4).

8.     Sanders was assigned a specific territory in Kansas and Oklahoma that he describes as a "big territory," requiring travel from Muskogee, Oklahoma to Payloa, Kansas. (*Id.*).

9.     As a foreman general, Sanders was on-call 24 hours per day, seven days a week and he would have to respond to emergency calls by himself in the event a train broke down. (*Id.* at 29:10-16; 33:7-22).

10.     When a train broke down, Sanders was required to drive a company vehicle to the train to make the repairs and he would "very seldom" have passengers with him because most of the time he was by himself "in the middle of the night." (*Id.* at 32:12-33:6)

11.     Sanders' job duties included climbing on, off, and under rail cars in performing inspections and making repairs and he sometimes had to "carry a knuckle." (*Id.* at 34:24-35:24).

12.     A "knuckle" is a pivoting hook-like casting that fits into the head of a coupler (which connects rail cars) weighing approximately 86 pounds. (Declaration of Daniel Torres ("Torres Decl."), attached as Ex. B, ¶ 6).

13.     Sanders worked in extreme heat, sometimes reaching 100 degrees in the summer and very cold temperatures in the winter in Kansas and Oklahoma. (Sanders Dep. at 38:1-14).

14. Incumbents in the foreman general position must frequently inspect and make repairs on their own when they are on-call, including replacing air hoses, using torches to make repairs, or cutting out knuckles and replacing them. (Torres Decl. ¶ 5).

**B.    Sanders Has Bleeding Ulcer and Cardiac Arrest**

15. In June 2018, Sanders woke in the middle of the night with shortness of breath and abdominal pain and was taken by ambulance to the emergency room for what he later learned was a bleeding ulcer.  (Sanders Depo. 48:25-50:16).

16. Sanders underwent surgery to repair the bleeding ulcer that was performed by Dr. Charles Y. Ro, MD, a general surgeon (Sanders Dep. 52:19-53:2; Deposition of Dr. Charles Y. Ro, MD ("Ro Dep."), attached as Ex. A2, at 4:22).

17. While in the hospital, Sanders suffered cardiac arrest and had to be resuscitated.  (Sanders Dep. at 53:3-10).

18. Sanders was also diagnosed with acute kidney failure and chronic kidney disease.  (*Id.* at 53:14-19).

19. Sanders informed Union Pacific of his hospitalization, and he requested and Union Pacific granted a medical leave of absence ("MLOA").  (*Id.* at 55:11-57:6).

**C.    Union Pacific Grants Sanders Medial Leave of Absence and Notifies Him that He Need to Complete a Fitness-For-Duty Review Before Returning to Work**

20. On July 22, 2018, Union Pacific sent Sanders a letter informing him that he was granted MLOA from June 26, 2018 to July 31, 2018.  (*Id.*; Sanders Dep. Exhibit 7, Letter from Union Pacific to Sanders dated July 22, 2018, attached as Ex. A3).

21.     In the letter, Union Pacific informed Sanders that he needed to complete a Fitness-For-Duty ("FFD") review prior to returning to work including providing medical records regarding his medical treatment. (*Id.*).

22.     The letter explained to Sanders how he could submit the medical records including using bar code cover sheet. (*Id.*).

23.     Union Pacific asked Sanders to provide copies of: the operation/surgery/procedure report; the physician's dictated hospital discharge summary; the emergency room records; diagnostic study reports; physician clinic notes; return to work release; and a list of any limitations/restrictions and their duration. (*Id.*).

24.     Following Union Pacific's standard procedure, Dr. John Charbonneau, Union Pacific's Assistant Medical Director, oversaw Sander's FFD review. (Deposition of Dr. John Charbonneau ("Charbonneau Dep."), attached as Ex. A4, at 4:22-6:1).

25.     On August 2, 2018, Union Pacific sent another letter to Sanders extending his MLOA until August 31, 2018, and again requesting that he supply the already requested medical records in connection with his FFD before returning to work. (Sanders Dep. at 58:2-25; Sanders Dep. Exhibit 8, Letter from Union Pacific to Sanders dated August 2, 2018, attached as Ex. A5).

26.     On or about August 23, 2018, Sanders submitted to Union Pacific a note from Dr. Ro that stated he could return to work on August 27, 2018 with no restrictions and from Kathy Verhaar, an administrative employee who worked for his Nephrologist, Dr. Nadine Aboul-Madg, stating he could return to "Normal Work" on September 3, 2018. (Sanders Dep. 59:6-61:3; Sanders Dep. Exhibit 9, Fax from Sanders to Union Pacific

dated August 23, 2018, attached as Ex. A6; Deposition of Dr. Nadine Aboul-Madg ("Aboul-Madg Dep."), attached as Ex. A7, 25:11-22).

27.     Dr. Ro did not evaluate Sander's cardiac functions when he issued a note stating that he could return to work.  (Ro Dep. at 36:7-12; 37:11-22).

28.     Dr. Aboul-Madg does not recall consulting with Ms. Verhaar on the Return to Work Release she issued for Mr. Sanders, though typically she would have provided input on such a document. (Aboul-Madg Dep. at 25:23-8). Regardless, Dr. Aboul-Madg never assessed whether Sanders had cardiac conditions that would require functional or work restrictions. (*Id.* at 35:1-16).

29.     Dr. Ro and Dr. Aboul-Madg do not recall specifically discussing or assessing Sander's specific job duties before these return to work notes were issued. (Ro Dep. at 10:7-11:8; Aboul-Madg Dep. at 12:24-13:11; 28:15-29:8).

30.      On September 11, 2018, Sanders submitted some but not all of the medical information that Union Pacific requested in their July 22, 2018 and August 2, 2018 letters that was necessary to complete his FFD.  (Sanders Dep. at 60:11-67:15; 70:10-71:6; Sander Dep. Exhibit 10, Fax from Sanders to Union Pacific dated September 11, 2018, attached as Ex. A8).

31.     On September 20, 2018, Union Pacific sent another letter to Sanders requesting that he supply information as to his current condition with level of function, anticipated return-to-work date, work restrictions or requirements with expiration dates, and prescription medication by October 11, 2018. (Sanders Dep. at 67:16-68:3; Sanders Dep. Exhibit 11, Letter from Union Pacific to Sanders dated September 20, 2018,

attached as Ex. A9).

32. On October 29, 2018, Sanders requested Union Pacific complete a form so that he could continue to receive compensation through the Railroad Retirement Board ("RBB") while he was on his MLOA. (Sanders Dep. at 68:4-69:15; Sanders Dep. Exhibit 12, Fax from Sanders to Union Pacific Dated October 29, 2018, attached as Ex. A10).

33. Union Pacific completed and faxed the requested form on October 29, 2018, explaining to the RBB that Sanders had to undergo a medical review before Union Pacific could clear his to return to work and stating that his estimated return to work date was March 1, 2019. (Sanders Dep. Exhibit 13, Fax from Sanders to Union Pacific Dated October 29, 2018, attached as Ex. A11).

34. On October 25, 2018, Sanders finally provided to Union Pacific the medical records requested they requested in their July 22, 2018 and August 2, 2018 letters. (Sanders Dep. at 70:10-71:4).

35. As a result, Union Pacific learned that Sanders had a host of serious medical conditions. (Charbonneau Dep. at 6:3-8).

36. Specifically, Dr. Charbonneau learned that Sanders' health problems included gastrointestinal bleeding, cardiac arrest, respiratory failure, prolonged periods of hypotension, kidney damage, chronic pain treated with opiates, and possible alcohol abuse. (*Id.* at 11:20-12:9; 16:19-22; 22:18-23:10; *see also* Ro Dep. Exhibit 2, June 27, 2018 Medical Notes, attached as Ex. A12 at page 3,16) (listing the following diagnoses and medical notes: acute hypoxemic respiratory failure, cardiac arrest (requiring intubation), alcohol abuse, duodenal ulcer hemorrhage, hypertension associated with

stage 2 chronic kidney disease, disc rupture, and a prescription for morphine (MS Contin), among other pain killers).

37.    On October 20, 2018 and November 9, 2018, Union Pacific sent letters to Sanders requesting that he supply office notes or clinic notes from his nephrologist, GT Medicine provider, cardiologist (including a maximal Bruce Protocol EET and new echocardiogram), and his provider address his chronic narcotic therapy in connection with his FFD before returning to work, and extending his MLOA until November 30, 2018. (Sanders Dep. at 71:7-13; 72:12-22; Sanders Dep. Exhibit 14, Letter from Union Pacific to Sanders dated October 30, 2018, attached as Ex. A13; Sanders Dep. Exhibit 15, Letter from Union Pacific to Sanders dated November 9, 2018, attached as Ex. A14).

38.    Eventually, Sanders slowly resolved each of Union Pacific's concerns about his health except for Dr. Charbonneau's concern about his aerobic capacity. (Charbonneau Dep. at 10:21-13; 12:10-15).

39.    For example, Sanders medical records indicated that he suffered from "alcohol abuse." (Ro Dep. Exhibit 2, June 27, 2018 Medical Notes at page 16). At Union Pacific's request, Sanders underwent an evaluation regarding his use of alcohol, which he completed, and he was cleared for that issue. (Sanders Dep. at 53:24-54:6; 72:2-16).

40.    Sanders medical records also indicated that he took the sedating prescription drug MS Contin (i.e., morphine). (Ro Dep. Exhibit 2, June 27, 2018 Medical Notes at page 3). January 22, 2019, Sanders received a letter from Union Pacific stating that he could not use MS Contin while working in a safety-critical job for Union Pacific. Sanders then discontinued use of that prescription drug. (Sanders Dep. at 78:1-79:13;

Sanders Dep. Exhibit 18, Letter from Union Pacific to Sanders dated January 22, 2019, attached as Ex. A15).

41.     On February 18, 2019, Union Pacific sent a letter to Sanders extending his medical leave through April 1, 2019, and requesting copies of his cardiologist's office notes, a cardiac stress test measured in METS to demonstrate aerobic capacity, with normal aerobic activity defined as at least 10 Metabolic Equivalents ("METS"), a recent echocardiogram, and detailed clinical evaluations regarding his spinal conditions, all of which was needed to complete the FDD. (Sanders Dep. at 80:17-81:1; Sanders Dep. Exhibit 21, Letter from Union Pacific to Sanders dated February 18, 2019, attached as Ex. A16).

42.     On February 26, 2019, Sander's primary care physician, Dr. Jimmy Buller, issued a note that Sanders could return to work on February 26, 2019 with two restrictions: no running (brisk walk not a problem) and not lifting anything greater than 50 pounds. (Deposition of Dr. Jimmy Buller ("Buller Dep.") attached as Ex. A17 at 24:1-5; Buller Dep. Exhibit 8, attached as Ex. A18).

43.     Dr. Buller did not evaluate Sander's cardiac functions when he issued the note stating that he could return to work, nor was Dr. Buller familiar with Sander's job duties at Union Pacific.  (Buller Dep. at 33:4-10; 10:5-15).

44.     On March 26, 2019, Union Pacific sent another letter to Sanders extending his medical leave through April 30, 2019 and requested a copy of his maximal Bruce protocol exercise tolerance test measured in METs, which was needed to complete the FDD. (Sanders Dep. at 83:14-19; Sanders Dep. Exhibit 23, Letter from Union Pacific to

Sanders dated March 26, 2019, attached as [Ex. A19]).

45.     Sanders underwent a treadmill aerobic capacity stress test, also known as the "Bruce protocol." He exercised for 4 minutes and 8 seconds and he achieved only 4.6 METS. (Deposition of Dr. J. Nicholas ("Nicholas Dep."), 21:21-25:24, attached as Ex. A20; Nicholas Dep. Exhibit 5, Exercise Stress Test dated December 21, 2018, attached as Ex. A21).

46.      Though Sanders claims that he stopped the Bruce protocol because of his knees, his medical records indicate that he stopped the test because of "fatigue." (Sanders Dep. 75:10-24; Exercise Stress Test dated December 21, 2018).

47.     Sander's cardiologist Dr. Nicolas confirmed that there is no reason his medical records would be inaccurate and "the most salient thing noted" for the reason he stopped the Bruce protocol was that "he was fatigued." (Nicholas Dep. at 25:19-21; 26:20-23).

### D.     Union Pacific Makes a Fitness-for-Duty Decision and Issues Sanders Permanent Work Restrictions

48.     Dr. Charbonneau determined that, taking into consideration the need for heavy lifting with walking, use of heavy tools, and environmental conditions, Sander's job required that the individual have a MET level of 7 or 8. Under controlled circumstances, Sanders only demonstrated 4.6 METS. (Charbonneau Dep. at 16:18-25).

49.     Sanders very low MET score was a predictor of adverse cardiac outcomes and an indicator of very low level aerobic fitness. (*Id.* at 15:9-10; 23:15-18).

50.     Dr. Charbonneau testified that "when you combine heavy lifting with walking, with hand tools, environmental conditions, again the overall fitness level needs to be at 7 or 8 METS for that position." (*Id.* at 16:18-21).

51.     A MET level at 4 is a low level, showing low exercise tolerance. A person will generally achieve 7 METS at a fairly brisk walk (without jogging). (Nicholas Dep. at 24:10-17).

52.     At 4.6 METs, Sanders was not close to where he needed to be to safely perform the totality of his job. (Charbonneau Dep. at 16:23-25).

53.     After receiving the medical records submitted by Sanders, including the Bruce protocol test that showed that Sander's aerobic capacity was 4.6 METS, Dr. Charbonneau determined the Sanders was medically cleared to work with the following permanent work restrictions:

> a. He could not perform work involving more than light physical exertion (as defined by the U.S. Department of Labor), not to lift over 10 pounds frequently or 20 pounds occasionally. He was most appropriately suited for office jobs or similar work only.

> b. He could not perform prolonged work in conditions of high heat and humidity, or excessive cold.

(Charbonneau Dep. at 16:18-25; 12:10-15; 27:7-9); (Sanders Dep. Exhibit 25, Letter from Union Pacific to Sanders dated April 15, 2019, attached as Ex. A22).

54.     These restrictions were ongoing but could be reassessed. (*Id.*).

55.      Union Pacific's Health and Medical Department sent Sander's medical restrictions form to Daniel Torres ("Torres"), General Superintendent ("GST"). (Torres Decl., ¶¶ 2, 8).

56.     Torres determined that Sanders could not perform the essential functions of his job with these medical restrictions and that he could not be reasonably accommodated.  (Torres Decl. ¶¶ 9-10).

57.     Torres subsequently realized that Sanders was no longer within his line of supervision but that he actually reported to the Heartland Service Unit, which was under Kelli Dunn, GST.  Ms. Dunn then signed off on the medical restriction form for Sanders. (Torres Decl. ¶ 11).

58.     Sanders was informed of these medical restrictions on April 15, 2019. (Sanders Dep. at 85:10-15; Letter from Union Pacific to Sanders dated April 15, 2019).

59.     Sanders admitted that he could not perform his job with these medical restrictions. (Sanders Dep. at 87:6-25).

60.     Dr. Charbonneau told Sanders that if could take the Bruce protocol and obtain acceptable results, he could return to work.  (*Id.* at 89:13-90:8).

61.     Sanders had resolved Union Pacific's concerns about alcohol abuse and his use of MS Contin, and the only issue preventing his return to work was Sanders' unsatisfactory Bruce protocol results. (*Id.*).

62.     Through cardiac rehabilitation, Sanders could possibly improve his Bruce protocol results. (Charbonneau Dep. at 23:19-23).

63.     Sanders, however, never attempted to perform the Bruce protocol test after his initial test.  (Sanders Dep. at 89:2-5).

64.     Sanders admits that he did not ask for any reasonable accommodation from Union Pacific, and he did not contact Union Pacific's vocational rehabilitation department

to see if there were other jobs open and available to him. (*Id.* at 93:24-94:1).

65.     Sanders also admits that he does not have an actual disability. (*Id.* at 93:13-16).

**I.**
## **STANDARD OF REVIEW**

Summary judgment "is appropriate when the evidence viewed in the light most favorable to the nonmoving party, demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Hanger v. Lake County*, 390 F.3d 579, 582 (8th Cir. 2004). To survive a motion for summary judgment, the plaintiff must support his allegations with "'sufficient probative evidence [that] would permit a finding in her favor on more than mere speculation, conjecture, or fantasy." *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992) (quotation omitted), *cert. denied*, 507 U.S. 913 (1993).

As explained below, Sanders cannot establish any genuine issues of material fact, and Union Pacific is entitled to judgment as a matter of law on all of Sander's claims.

## II.
## ARGUMENT

### A. Union Pacific Is Entitled to Summary Judgment on Sander's ADA Disparate Treatment Claim

Sanders alleges disability discrimination under the ADA. (Filing No. 1, Count I). He has no direct evidence of disparate treatment,[2] so his claim falls under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). Under that framework, Sanders bears the burden of establishing his prima facie case, and if he does so, the burden of production shifts to Union Pacific to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If Union Pacific articulates such a reason, the burden returns to Sanders to show Union Pacific's proffered reason is pretextual. *Id.*

To establish a prima facie case for discrimination, Sanders must show that he: (1) is disabled under the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment decision because of the disability. *Kallail v. Alliant Energy Corporate Servs., Inc.,* 691 F.3d 925, 930 (8th Cir.2012). If Sanders fails to establish any element of his prima facie case, summary judgment is proper. *Kellogg v. Union Pac. R. Co.,* 233 F.3d 1083, 1086 (8th Cir. 2000).

---

[2] Direct evidence of discrimination is evidence that "establishes a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision. Direct evidence does not include stray remarks in the workplace, statements by nondecisionmakers, or statements by decision-makers unrelated to the decisional process itself." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 933 (8th Cir. 2006) (internal quotations and citations omitted).

1.     Sanders is Not Disabled Under the ADA

Sanders has the burden to prove that he has a disability, as that term is defined by the ADA.  42 U.S.C. § 12102(1).  An individual is "disabled" under the ADA if the person: (a) has a physical or mental impairment that substantially limits one or more major life activities; (b) has a record of such an impairment; or (c) is regarded as having such an impairment. *Id.*  Because he does not have a disability, Sanders cannot satisfy his prima facie case.

i.     Sanders Does Not Have an "Actual Disability"

Sanders admits that he does not have an actual disability. (SOF 65). He, therefore, does not have an "actual disability" under 42 U.S.C. § 12102(1)(a).[3]

ii.     Union Pacific Did Not "Regard" Sanders as Disabled

To establish that he was "regarded as" disabled, Sanders must show that Union Pacific subjected him to an adverse action "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Fischer v. Minneapolis Pub. Sch.,* 792 F.3d 985, 988 (8th Cir. 2015) (citing 42 U.S.C. § 12102(1), (3)(A)).

Courts emphasize that an employer does not "regard" an employee as disabled

---

[3] In his Interrogatory Answers, Sanders claims that he was disabled when he suffered from a bleeding ulcer. (Ex. A23, Interrogatory Response No. 11). This condition, though, started in June 2018 and was fully resolved August 2018 (Filing No. 1, ¶¶ 17, 19).  Accordingly, it is not a disability because it was a temporary condition. *Gretillat v. Care Initiatives*, 481 F.3d 649, 653 (8th Cir. 2007) (the "impairment must be of an extended or permanent duration…"; 29 C.F.R. § Pt. 1630, App. ("[T]he duration of an impairment is one factor that is relevant in determining whether the impairment substantially limits a major life activity. Impairments that last only for a short period of time are typically not covered, although they may be covered if sufficiently severe.").

when it imposes work restrictions based on the belief that the employee cannot perform his job. In *Fischer,* the Eighth Circuit determined that the employer did not regard a janitor engineer as disabled by acknowledging that he lacked the requisite strength for a physically demanding job and thus faced an increased risk of injury. *Fischer*, 792 F.3d at 989. The employer's belief that the employee did not have sufficient strength was not equivalent to believing that the employee suffered from a "physical impairment" related to his back. *Id.* (citing 28 C.F.R. § 36.104)). Similarly in *Watt*, the court affirmed there was "a difference between being perceived as impaired and being perceived as unable to perform a job duty." *Watt v. City of Crystal*, 14-CV-3167 (JNE/JJK), 2015 WL 7760166, at *5 (D. Minn. Dec. 2, 2015) (finding that the plaintiff's "regarded as" claim failed in part because defendant based its termination decision on the belief that plaintiff (a police officer) was "too angry or erratic to carry a firearm or patrol the streets."). Likewise, in *Bruzzese v. Sessions*, 725 F. App'x 68 (2d Cir. 2018), the plaintiff argued that his employer reassigned him to a different position because it regarded him as having a mental impairment. Although plaintiff's supervisor acknowledged that he was "worried about … [plaintiff's] mental and emotional stability," this statement did not refer to any mental disability because it merely expressed concerns about plaintiff's behavior and how it affected his ability to safely do the job. *Bruzzese*, 725 F. App'x at 72.

"If a restriction is based upon the recommendations of physicians, then it is not based upon myths or stereotypes about the disabled and does not establish a perception

of disability."[4] *Wisbey v. City of Lincoln, Neb.*, 612 F.3d 667, 672–73 (8th Cir. 2010) *abrogated on other grounds by Torgerson v. City of Rochester,* 643 F.3d 1031 (8th Cir. 2011). Sander's restrictions were based on the recommendation of Union Pacific's Assistant Medical Director, Dr. Charbonneau, who thoroughly examined Sander's medical records. Given his cardiac arrest episode, Dr. Charbonneau required that Sanders submit an acceptable Bruce protocol test, at least in the 7-10 MET range. (SOF 41, 48). Under controlled circumstances, Sanders only demonstrated 4.6 METS and never underwent another Bruce protocol, despite his option to do so. (SOF 48, 60, 62-63). Dr. Charbonneau determined that Sanders very low MET score was a predictor of adverse cardiac outcomes and rendered him unable to perform his very physically demanding job, which involved working in harsh outdoor conditions, lifting or carrying objects weighing between 25 and 50 pounds (occasionally even up to 86 pounds), driving alone to perform train repairs, climbing on, around, and under train cars, and using various heavy machines and tools, like welding equipment, hoists, and cranes. (SOF 48-54, 4-6). Sanders own primary care physician Dr. Buller imposed a 50 pound lifting restriction on Sanders, (SOF 42), meaning that he could not lift or carry knuckles, which weigh in excess of 70 pounds (SOF 12). Moreover, Dr. Charbonneau told Sanders that if he completed and submitted an acceptable Bruce protocol score, he could return to work. (SOF 60). All of this this reflects that Dr. Charbonneau made a bona fide medical judgment grounded

---

[4] This remains true even after the ADA Amendments Act of 2008 (ADAAA) broadened the scope of the "regarded as" prong. *Watt*, 2015 WL 7760166, at *5; *Lopez-Lopez v. Robinson Sch.,* 958 F.3d 96, 107 (1st Cir. 2020).

in safety, not unfounded prejudice that the "regarded as" prong is designed to combat. *See Jackson v. Union Pacific Railroad Co.*, 4:19-cv-00060-RGE-RAW, p. 30-31 (S.D. Iowa 2021) (dismissing disparate treatment claim when Union Pacific issued "work restrictions because of its legitimate concern for the safety of [plaintiff] and others on the job based on its doctors' reasonable medical judgments.").

Finally, Sanders cannot establish that Union Pacific regarded him as disabled by submitting him for an FFD examination. The Eighth Circuit rejected this view in *Wisbey v. City of Lincoln,* 612 F.3d 667, 673 (8th Cir. 2010) *abrogated on other grounds by Torgerson v. City of Rochester,* 643 F.3d 1031 (8th Cir. 2011), explaining that "employers are permitted to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims, and fitness-for-duty exams are considered a reasonable means of making this determination." *See also Tice v. Ctr. Area Transp. Auth.,* 247 F.3d 506, 515 (3d Cir. 2001) (recognizing that a request for an "appropriately-tailored examination only establishes that the employer harbors *doubts* (not certainties) with respect to an employee's ability to perform a *particular* job," and "[d]oubts alone do not demonstrate that the employee was held in any particular regard.") (emphasis in original).

3. <u>Sanders was Not Qualified Under the ADA Because He Could Not Perform the Essential Functions of His Position</u>

Even if Sanders can show he has a "disability" as defined by the ADA, his disparate treatment claim fails because he is not a qualified individual. To show that he is qualified, Sanders must establish that he can perform the essential functions of his position with or

without a reasonable accommodation. *Otto v. City of Victoria*, 685 F.3d 755, 758 (8th Cir. 2012); 42 U.S.C. § 12111(8).

An employee is not qualified under the ADA if a physician restricts the individual from performing essential job duties. *Alexander v. Northland Inn,* 321 F.3d 723, 727 (8th Cir. 2003). "The ADA does not force employers to permit employees to perform functions restricted by a physician." *Otto v. City of Victoria*, 834 F. Supp. 2d 912, 917 (D. Minn. 2011), *aff'd*, 685 F.3d 755 (8th Cir. 2012). This is true even if the physician works for the employer because "[a]n employer is entitled to rely on the medical determinations made by its own medical professionals so long as the reliance is reasonable and in good faith." *Mundt v. U.S. Postal Serv.,* No. 00 C 6177, 2001 WL 1313780, at *6 (N.D. Ill. Oct. 25, 2001) (citing *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974-75 (7th Cir. 2000); *Rice v. Genova Prod., Inc.,* 978 F. Supp. 813, 821 (N.D. Ind. 1997) (explaining that an employer had a "right to rely" on its own doctor's opinion about whether the employee was medically qualified).

As explained above, based on Sander's extremely low Bruce protocol score, Dr. Charbonneau determined that Sanders could not perform work involving more than light physical work  (specifically, he could not lift over 10 pounds frequently or 20 pounds occasionally) and he could not perform prolonged work in conditions of high heat and humidity, or excessive cold. (SOF 53). Moreover, Sander's own primary care physician restricted him from lifting over 50 pounds.  (SOF 42). These restrictions rendered Sanders unqualified for his position, which required that he work in extreme weather conditions and be able to lift or carry objects weighing between 25 and 50 pounds, occasionally even

up to 86 pounds. (SOF 5-6).

Both Daniel Torres, General Superintendent ("GST"), and Kelli K. Dorn, GST for the new service unit in which Sanders worked, agreed that Sanders could not perform the essential functions of his job with these medical restrictions and he could not be reasonably accommodated. (SOF 55-57). Dr. Charbonneau's determination that Sander's Bruce protocol score was so low that he only qualified for jobs requiring light physical exertion was reasonable, and Union Pacific had a right to rely on it. An "employer's determination that a person cannot safely perform his job functions is objectively reasonable when the employer relies upon a medical opinion that is itself objectively reasonable," even if it conflicts with other medical opinions. *Michael v. City of Troy Police Dep't,* 808 F.3d 304, 307 (6th Cir. 2015). This Court applied the same rationale in *Clark v. Lyman-Richey Corp.,* No. 8:06CV669, 2008 WL 1733603, *7-8 (D. Neb. Apr. 10, 2008) (Bataillon, J.), in finding that the plaintiff, a truck driver, was not qualified under the ADA despite conflicting medical opinions about whether he had epilepsy. While the parties disputed the medical evidence, it still "support[ed] defendant's decision that plaintiff cannot perform the essential elements of his truck driving job," and the Court dismissed the ADA claim. *Id.* at *7.

4.  Union Pacific Had a Legitimate, Non-Discriminatory Basis for its Actions that Was Not Pretextual

Even if Sanders could establish a prima facie case for disparate treatment, his claim still fails because Union Pacific satisfies its burden to show a legitimate, non-discriminatory reason without pretext. As explained above, Union Pacific appropriately

submitted Sanders to an FFD to explore legitimate concerns that he was not able to safely perform the job. *Wisbey,* 612 F.3d at 673.

Sanders cannot show that Union Pacific's decision was pretext for discrimination, which requires him to produce ""substantial evidence of discrimination" because "evidence of pretext is viewed in the light of [an employer's] legitimate, non-discriminatory explanation." *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 992 (8th Cir. 2006). The issue is not whether Union Pacific's decision was ill-advised or unwise, but whether its stated reason for the FFD was false such that it was mere pretext for discrimination. *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008). In *Thomas v. Corwin*, 483 F.3d 516, 529 (8th Cir. 2007), the Eighth Circuit affirmed that the employer articulated legitimate reasons for an FFD evaluation and the plaintiff offered no evidence to suggest it was pretext for discrimination. The same is true here. Sanders suffered a significant health event (a bleeding ulcer requiring surgery) and Union Pacific had legitimate reasons to conduct a fitness-for-duty evaluation. What is more, his health history revealed several health issues that prompted concerns as to whether he could safely perform the job including, among other things, use of narcotic pain medication, references to alcohol abuse in his medical records, and cardiac arrest requiring intubation. No reasonable juror could conclude that Union Pacific's decision to require Sanders to submit to a fitness-for-duty examination was pretext for discrimination.

What is more, Dr. Charbonneau methodically reviewed the various issues that were of concern and for those Sanders could mitigate (e.g., stopping taking narcotic pain medication and showing he did not suffer from alcohol abuse), he was cleared. However,

the evidence shows that Dr. Charbonneau determined that he was not fit to return to work by reasonably relying on the Bruce Protocol test results that demonstrated Sanders was so fatigued he had to stop the test before even reaching a brisk-paced walk. (SOF 45-47, 51). Though Sanders claims he stopped the test because of his knees, Union Pacific was reasonable in relying on his medical records that confirmed he stopped because of fatigue.  As Sanders cardiologist Dr. Nicolas testified, there is no reason his medical records would be inaccurate and "the most salient thing noted" for the reason he stopped the Bruce protocol was that "he was fatigued." (SOF 47). The fact that Sander's own primary care physician restricted him from lifting over 50 pounds, rendering him unable to perform the essential functions of his job, further undermines Sander's claim that Union Pacific's medical restrictions were pre-text for discrimination.  (SOF 42).

The evidence shows that Union Pacific relied on Dr. Charbonneau's reasonable opinion and there is no evidence that Union Pacific's safety rationale was pretext for discrimination.  *Jackson*, 4:19-cv-00060-RGE-RAW, p. 34 (court held plaintiff was unable to show pretext because there was no evidence "Union Pacific shifted its explanation for issuing the work restrictions, or deviated from its stated policies regarding issuing work restrictions after a qualified medical event to prevent him from returning to work.").  There is simply no evidence on which a jury could conclude Union Pacific engaged in disparate treatment here.

C.     **Union Pacific Is Entitled to Summary Judgment on Sander's ADA Disparate Impact Claim**

Though not clearly alleged in his Complaint, in his Interrogatory Answers, Sanders appears to claim that he is asserting a "disparate impact" claim under § 12112(b)(6) of

24

the ADA . Specifically, Sanders responded as follows to Union Pacific's Interrogatory No. 23:

> INTERROGATORY NO. 23: State whether you claim Defendant has a policy or practice that has a disparate impact on individuals with disabilities and, if so, the facts that support such claim.
>
> **ANSWER: Plaintiff does so claim, which is supported by Defendant having a policy or practice of requesting its employees' medical records and/or subjecting them to examinations without the requisite cause, issuing unnecessary and/or overbroad medical restrictions, and/or failing to accommodate any necessary restrictions.**
>
> **SUPPLEMENTAL ANSWER: Defendant has a policy of requesting employees medical records without the requisite cause, issuing unnecessary and/or overbroad medical restrictions, and failing to accommodate such restrictions even when reasonable.**

(Sander's Supplemental Interrogatory Answers, attached as Ex. A23). A disparate impact plaintiff must: (1) identify a specific employment practice; and (2) present statistical evidence showing that the practice caused the plaintiff to suffer an adverse action because of membership in a protected group. *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 953 (8th Cir. 2001);[5] *Puffer v. Allstate Ins. Co.,* 675 F.3d 709, 717 (7th Cir. 2012) (explaining that a plaintiff alleging an ADA disparate impact claim must establish causation by "offering statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."). The burden then shifts to the

---

[5] While *Evers* was not an ADA case, courts in the Eighth Circuit recognize that ADA plaintiffs must still adduce statistical evidence to support a disparate impact claim. *Coons v. BNSF Ry. Co.,* 268 F. Supp. 3d 983, 987 (D. Minn. 2017) (considering whether a railroad's practice of requiring applicants who disclose certain medical conditions to undergo medical testing at the applicant's expense has a disparate impact on individuals with disabilities under the ADA).

employer to produce evidence showing a legitimate business reason for the challenged practice. *Id.*

First, as explained above, Sanders is not a "qualified individual" under the ADA and his disparate impact claim fails on those grounds alone. *Higgins v. Union Pac. R.R. Co.,* 303 F. Supp. 3d 945, 960 (D. Neb. 2018), *aff'd,* 931 F.3d 664 (8th Cir. 2019) (dismissing plaintiff's disparate impact claim because the plaintiff was not qualified under the ADA).

Second, it is "not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Smith v. City of Jackson, Miss.,* 544 U.S. 228, 241 (2005). The employee is instead "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Id.* (citations and quotations omitted). "Identifying a specific practice is not a trivial burden … the requirement has bite." *Meacham v. Knolls Atomic Power Lab.,* 554 U.S. 84, 100-01 (2008). Sanders has not met this burden. Rather, he broadly alleges that, "Defendant has a policy of requesting employees [*sic*] medical records without the requisite cause, issuing unnecessary and/or overbroad medical restrictions, and failing to accommodate such restrictions even when reasonable."   (Sander's Supplemental Interrogatory Answers).   This is insufficient as Union Pacific is left guessing what, exactly, is the alleged policy or practice that had a disparate impact Sanders and others. *See Bennett v. Nucor Corp.,* 656 F.3d 802, 817 (8th Cir. 2011); *Paul v. Metro. Council*, No. CIV. 10-4759 JRT/FLN, 2012 WL 3734147, at *4, n.6 (D. Minn. Aug. 28, 2012) (awarding summary judgment to employer because

plaintiff never "identified any specific employment practice alleged to have a disparate impact.").

Sander's failure to identify *what* facially neutral policy caused him to be screened out is compounded by the fact that he has no evidence that anyone *else* was affected by the same unidentified policy. *Smith v. Miami-Dade Cty.,* 21 F. Supp. 3d 1292, 1295 (S.D. Fla. 2014), *aff'd,* 621 F. App'x 955 (11th Cir. 2015) (recognizing that "evidence that one disabled person was adversely affected by a particular employment practice is not sufficient to create a prima facie case of a disparate impact under the ADA."). Here, Union Pacific inquired into Sander's fitness-for-duty after he suffered a significant health event in which he was hospitalized, suffered from cardiac arrest and had to be resuscitated, and was diagnosed with acute kidney failure and chronic kidney disease. Union Pacific then conducted an individualized analysis of several severe health conditions that may have impacted Sander's ability to safely perform this job. Such an individualized analysis cannot be said to be caused by the disparate impact of a policy that Sanders is unable to even identify.

Third, Sanders has no statistical evidence to support whatever it is he alleges is discriminatory. *Pierce v. Marsh*, 859 F.2d 601, 604 (8th Cir. 1988) (affirming summary judgment because plaintiff did not submit statistical evidence of disparate effect); *Roberts v. City of Chicago*, 817 F.3d 561, 566 (7th Cir. 2016) (affirming dismissal of ADA claim that failed to allege a "relevant and statistically significant disparity between disabled and non-disabled applicants."). For all of these reasons, Sander's disparate impact claim fails as a matter of law.

Finally, under § 12112(b)(6), qualification standards are permitted under ADA if they are, "shown to be job-related for the position in question and is consistent with business necessity." Accordingly, even if Sanders were able to identify a policy that had an disparate impact, his claim fails for the same reasons argued in Section E below, because Union Pacific's inquiry and decision to place restrictions on Sanders were job-related and consistent with business necessary.

**D.** **Union Pacific Is Entitled to Summary Judgment on Sander's Failure to Accommodate Claim**

Sander's failure to accommodate claim fails because Sanders never asked for an accommodation. (SOF 64). Indeed, he never even contacted Union Pacific's vocational rehabilitation department to see if there were other jobs open and available to him. (*Id.*). "The 'predicate requirement' triggering the interactive process is the employee's request for the accommodation." *Kratzer v. Rockwell Collins, Inc.,* 398 F.3d 1040, 1045 (8th Cir. 2005). When the employee never seeks an accommodation, a failure to accommodate claim cannot survive summary judgment. *Walz v. Ameriprise Fin., Inc.,* 779 F.3d 842, 847 (8th Cir. 2015). Sanders has also failed to identify any accommodation that would allow him to safely perform the job. Therefore, Sander's failure to accommodate claim should be dismissed.

**E.** **Union Pacific Is Entitled to Summary Judgment on Sander's Impermissible Medical Examination Claim**

In Sander's third cause of action, he alleges that Union Pacific made an unlawful medical inquiry by "requiring him to undergo a fitness for duty examination." (Filing No. 1, Complaint ¶ 42). Under the ADA, employers cannot "make inquiries of an employee as

28

to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4(A). Employers may, however, inquire into the employee's ability to perform job-related functions. 29 § C.F.R. 1630.14(c). Employers may use "reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims … and fitness-for-duty exams are considered a reasonable means of making this determination." *Wisbey*, 612 F.3d at 673.

Employers must justify a medical exam by showing that "it is job-related and that the asserted 'business necessity' is vital to the business;" also the exam must be "no broader or more intrusive than necessary." *Parker v. Crete Carrier Corp.,* 839 F.3d 717, 722 (8th Cir. 2016). "[C]ourts will readily find a business necessity if an employer can demonstrate ... a medical examination or inquiry is necessary to determine ... whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties…" *Id.* Reasonable doubts about the employee's ability to safely perform the job meet the legitimate business necessity standard. *Thomas,* 483 F.3d at 527.

Sander's case shares many similarities with *Jones v. Sewerage & Water Bd. of New Orleans,* No. CV 17-8076, 2018 WL 4909911, at *7 (E.D. La. Oct. 10, 2018), in which the court dismissed plaintiff's unlawful medical inquiry claim on summary judgment. Similar to Sanders, the plaintiff in *Jones* was a laborer whose job required strenuous activity. *Id.* at *5. After he began experiencing chest pains on the job, the employer

required fitness for duty documentation from a cardiologist. The court determined that the employer was reasonable in its request because the plaintiff's chest pains were a legitimate safety concern. *Id.* at *7. Likewise, this Court confirmed that a Union Pacific engineer who experienced a panic attack "obviously requir[ed] immediate removal from his job duties, and referral for a medical evaluation." *Higgins v. Union Pac. R.R. Co.,* 303 F. Supp. 3d 945, 960 (D. Neb. 2018), *aff'd,* 931 F.3d 664 (8th Cir. 2019) (observing that Union Pacific's process of referring employees for FFD examinations based on legitimate concerns is "rooted in train safety.").

Here, Union Pacific meets its burden to show that referring Sanders to an FFD exam was job-related and consistent with a business necessity. Sander's position required him to drive alone to inspect and repair railcars, use dangerous tools, work in extreme weather conditions, and push/pull objects weighing between 25 lbs (frequently) and 50 lbs often with assistance (occasionally), including knuckles that can weigh upwards of 80 pounds (SOF 4-7, 9-10, 11-14).  Union Pacific was thus reasonable in seeking confirmation from medical professionals that Sanders could still safely perform those duties after he took a MLOA because he was hospitalized and underwent surgery for a bleeding ulcer, suffered from cardiac arrest and had to be resuscitated, and was diagnosed with acute kidney failure and chronic kidney disease. Based on these facts, Union Pacific had a legitimate reason to evaluate Sander's fitness for duty and ensure that he was still able to safely perform his physically demanding and dangerous job.

The scope of Sander's FFD review was also no broader than necessary to make that determination. Given the safety sensitive nature of Sander's position, Union Pacific

30

sought records and confirmations from Sanders regarding his hospitalization for a bleeding ulcer, his cardiac arrest, his alcohol use, and his use of MS Contin, a sedating prescription drug. (SOF 23, 31, 37-41, 44). After resolving concerns with several of Sander's several health conditions, all that remained was obtaining records that resolved concerns about his cardiac health.

In short, Union Pacific was entirely reasonable in evaluating Sander's fitness for duty to perform physically demanding work given his hospitalization and multiple diagnoses, and there is no evidence that the FFD review went beyond a narrow inquiry into these concerns. Sander's unlawful medical inquiry claim therefore fails and should be dismissed.

**F.** **Union Pacific Is Entitled to Summary Judgment on its Direct Threat Defense**

For many of the same reasons that Sanders cannot show he is ADA-qualified, Union Pacific establishes its direct threat defense. (Filing No. 9, ¶ 9). Summary judgment is warranted when an employee poses "a direct threat to the health or safety of other individuals in the workplace." *EEOC v. Wal-Mart Stores, Inc.,* 477 F.3d 561, 571 (8th Cir. 2007) (citing 42 U.S.C. § 12113(b)). The employer must make an individualized assessment of the person's ability to work safely as well as a reasonable medical judgment relying on current medical knowledge or the best available objective evidence. 29 C.F.R. § 1630.2(r). Factors to consider include: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. (*Id*).

Neither the Court nor the jury must become a medical expert to determine whether Union Pacific can establish its direct threat defense, which depends only on "the objective reasonableness of [the employer's] actions." *Michael*, 808 F.3d at 307 (citing *Bragdon v. Abbott,* 524 U.S. 624, 650 (1998)). *See also Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007) (reasoning that in a direct threat case "the fact-finder's role is to determine whether the employer's decision was objectively reasonable."). An employer's conclusion that an employee cannot safely perform the job "is objectively reasonable when the employer relies on a medical opinion that is itself objectively reasonable." *Michael*, 808 F.3d at 307. A medical opinion may conflict with other medical opinions and still be objectively reasonable. *Id.*

In *Witchet*, this Court held that the plaintiff was a direct threat and Union Pacific's restrictions were thus reasonable given the "imminence of the risk" and the "severity of the harm." (*Witchet*, p. 17, 20). The Court explained that Union Pacific's FFD process, which was similar to Sander's, was an "expressly individualized assessment of [plaintiff's] ability to safely perform the essential functions of the job." (*Witchet*, p. 19). Union Pacific's decision to issue temporary restrictions on the plaintiff was therefore "based on a reasonable medical judgment, in reliance on objective evidence." (*Id.* at 18). Allowing the plaintiff to keep performing safety sensitive work "could expose U.P. to a risk of liability that it is unwilling to take, and could expose the public to a risk of injury," and "[t]hough that risk may be small, the consequences are severe." (*Id.* at 20).

Union Pacific made a reasonable medical judgment when Dr. Charbonneau reviewed the relevant medical records and determined that Sanders did not have

sufficient aerobic capacity to safely perform his safety sensitive job, as Sanders very low MET score was a predictor of adverse cardiac outcomes. (SOF 49). And Union Pacific could rely on Dr. Charbonneau's risk assessment even if it differs from Sander's retained expert. *E.E.O.C. v. Schneider Nat., Inc.,* 481 F.3d 507, 510 (7th Cir. 2007) (an employer "is entitled to determine how much risk is too great for *it* to be willing to take) (emphasis in original). "Medical judgments are subjective and may vary from doctor to doctor, and a company is entitled to rely on the determinations made by its medical professionals as long as that reliance is reasonable and in good faith." *Bay v. Cassens Transp. Co.,* 212 F.3d 969, 975 n.4 (7th Cir. 2000). "Indeed, in many cases, the question whether one doctor is right that an employee can safely perform his job functions, or another doctor is right that the employee cannot, will be unknowable—unless the employer runs the very risk that the law seeks to prevent." *Michael*, 808 F.3d at 309. In *Michael*, the employer established its direct threat defense because "right or wrong," the medical opinions that it relied on were objectively reasonable. *Id.*

Finally, the consequences of Sanders suffering a sudden adverse cardiac event on the job would be catastrophic. Sanders could lose consciousness or control if he underwent cardiac arrest while driving his truck out to a repair, or while operating heavy machinery or tools, like electric and gas welding equipment, lifts and ATV's, overhead hoists and cranes. This would not only put himself as risk for severe injury or death, but others on the roads and at the locations where he works to repair railcars. Given these risks, Union Pacific made an informed judgment relying on Dr. Charbonneau's reasonable medical opinion, and thus prevails on its direct threat defense.

### III.
### CONCLUSION

For the foregoing reasons, Union Pacific requests that the Court enter an order

granting the Motion for Summary Judgment, dismissing Sander's Complaint in its entirety

with prejudice, awarding Union Pacific its costs, and any further relief the Court deems

proper.

Dated this 16th day of April 2021,

UNION PACIFIC RAILROAD COMPANY,
Defendant,


/s/ Susan K. Tvrdy
Susan K. Tvrdy (NE# 26687)
Scott Parrish Moore (NE# 20752)
BAIRD HOLM LLP
1700 Farnam Street, Suite 1500
Omaha, NE 68102
T: (402) 636.8268
F: (402) 344.0588
stvrdy@bairdholm.com
spmoore@bairdholm.com
**Attorneys for Defendant**


### CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with NECivR 7.1(d) (3) and further certify
that the word count function was applied to include all text, including the caption,
headings, footnotes, and quotations.  This document was prepared using Microsoft Word
2016 and contains 9,072 words.

Dated this 16th day of April, 2021

/s/ Susan K. Tvrdy

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Nicholas D. Thompson
Corey Stull

and I hereby certify that I have mailed by United States Postal Service the document to the following CM/ECF participants: None.

/s/ Susan K. Tvrdy

DOCS/2601179