## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| Allan Sanders, <br><br> Plaintiff, <br><br> v. <br><br> Union Pacific Railroad Co., <br><br> Defendant. | No. 4:20-cv-03023-JFB-SMB <br><br> **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE** |

## <u>INTRODUCTION</u>

This case should be about whether Union Pacific's continued refusal to allow Allan Sanders to return to work violates the Americans with Disabilities Act. Union Pacific's motion in limine, however, seeks to unilaterally narrow Sanders's claim, prevent him from offering important evidence, and otherwise keep the jury from fairly determining this case. Union Pacific's motion in limine should be denied for the below-discussed reasons.

## <u>FACTUAL BACKGROUND</u>

Sanders began working for Union Pacific on May 1, 1979. ( Dkt. 51 at 2.) Sanders held various positions before becoming a foreman general in the car department in Parsons, Kansas, which is the last position he held at Union Pacific. (*Id.*) As a foreman general, Sanders was on call twenty-four hours per day, seven days a week and he would have to respond to emergency calls by himself in the event a train broke down. (*Id.*) The essential functions of his job do not include climbing, making more than de minimis repairs, and/or carrying knuckles.( *Id.*)

In June 2018, Sanders was treated at an emergency room for what he later learned was a bleeding ulcer. (Dkt. 51 at 3.) Sanders underwent surgery to repair the bleeding ulcer. (*Id.*) While

at the hospital, he suffered a cardiac arrest and had to be resuscitated. (*Id.*) He was also diagnosed with acute kidney failure and chronic kidney disease at that time. (*Id.*)

Sanders submitted a letter from his surgeon, Dr. Charles Ro, stating Sanders could return to work on August 27, 2018 with no restrictions, and a letter from the office of his nephrologist, Dr. Nadine Aboul-Madg, stating he could return to "normal work" on September 3, 2018. (Dkt. 51 at 3.)

On September 20, 2018, Union Pacific requested that Sanders supply information as to his current condition with level of function, anticipated return-to-work date, work restrictions or requirements with expiration dates, and prescription medication. (Dkt. 51 at 3.) On October 25, 2018, Sanders provided additional medical records to Union Pacific. (*Id.*) Union Pacific then learned that Sanders had several serious medical conditions. (*Id.*) Specifically, those were gastrointestinal bleeding, cardiac arrest, respiratory failure, prolonged periods of hypotension, kidney damage, chronic pain treated with opiates, and possible alcohol abuse. (*Id.* at 3-4.)

As a brief aside, Sanders's alcohol and/or opiate use is not at issue. (Dkt. 51 at 4 n.3.) At Union Pacific's request, Sanders underwent an evaluation regarding his use of alcohol, which he completed, and he was cleared for that issue. (*Id.* at 4.) The record shows he ceased using MS Contin, which he had been prescribed for pain, in November 2018. (*Id.*)

Returning to what is at issue, on November 30, 2018, Union Pacific sent further correspondence to Sanders requesting office notes or clinic notes from his nephrologist, gastroenterologist, and cardiologist (including a maximal Bruce Protocol EET and new echocardiogram. (Dkt 51 at 4.) Sanders underwent a Bruce protocol stress test echocardiogram in December 2018. (*Id.*) He exercised for 4 minutes and 8 seconds, and he achieved only 4.6 METS. (*Id.*)

Though Sanders claims that he stopped the Bruce protocol because of his knees, his medical records indicate that he stopped the test because of "fatigue." (Dkt. 51 at 4.) The record shows Sanders's cardiologist, Dr. William Nicholas, M.D., testified that the notation that the test was stopped due to "fatigue" means the test was not stopped because of Sanders's heart. (*Id.*) Dr. Nicholas stated,

> Q  [S]he put "fatigue" instead of "my knees hurt"?
> A  [T]he most important thing of saying he stopped fatigued was that [the technician] thought he was fatigued and that he didn't stop because of chest pain . . . . So, once she says "fatigued," . . . that's her clue that says this didn't look cardiac to her.

(*Id.* at 4-5.) Also, the record shows that Sanders provided Union Pacific with evidence that he was on beta blockers, which limits a person's ability cause examinees to exercise and raise his or her heart rate and causes examinees to score artificially low on the Bruce protocol, to the point the test is useless for determining aerobic capacity. (*Id.* at 5.)

The results from a chemical stress test, which Sanders took because his knees prevented him from completing the Bruce protocol, show that Sanders's heart is fine. (Dkt. 51 at 5.) Sanders's cardiologist stated, "[T]he test results show t]hat [Sanders] had a good heart muscle and he did not have a large amount of ischemia . . . . without prominent scar ischemia. And so, overall, he passed the test." (*Id.*) The treating cardiologist also testified that at the time he examined Sanders, he was fit to return to work as of September 3, 2018. (*Id.*) He found no cardiac condition that would have prevented Sanders from working. (*Id.*) Sanders's primary-care physician also wrote that Sanders's heart was fine In a February 26, 2019 letter to Union Pacific. (*Id.*)

Neither Sanders's cardiologist, Dr. Nicholas, nor his primary care physician, Dr. Buller, placed cardiac restrictions on Sanders for returning to work. (Dkt. 51 at 5.) Dr. Buller testified that Sanders had coded and was close to expiring because he had a pretty significant bleeding ulcer

that required nine units of blood. (*Id.*) Sanders's temporary renal failure "was also secondary to that bleed and the anemia, which resolved once that resolved." (*Id.* at 5-6.) He also testified it was Sanders's knees that likely prevented him from completing then Bruce protocol. (*Id.* at 6.)

On February 26, 2019, Dr. Buller sent correspondence to Union Pacific stating that Sanders could return to work on February 26, 2019 with two restrictions due to musculoskeletal problems: no running (brisk walk not a problem) and not lifting anything greater than 50 pounds. (Dkt. 51 at 6.) The restrictions were prescribed for Sanders's back condition, which resolved shortly thereafter. (Dkt. 51 at 6 n.5.) They had nothing to do with Sanders's cardiac condition. (*Id.*)

The letter is nevertheless relevant because in it Dr. Buller also wrote "[Sanders'] cardiovascular history is positive for essential hypertension which is controlled with low dose medications. His most recent thallium stress test was normal with an ejection fraction of 57%." (Dkt. 51 at 6.) Dr. Buller testified this "means [Sanders] doesn't . . . have coronary artery disease and his . . . heartbeat is contracting within normal ranges." (*Id.*)

Following Union Pacific's standard procedure, Dr. John Charbonneau, Union Pacific's Assistant Medical Director, oversaw Sanders's fitness-for-duty review. (Dkt. 51 at 6.) He reviewed Sanders's medical records and found the most problematic thing was Sanders's "very low aerobic fitness level, his very low capacity level" which would mean he would be "in the sedentary light category of work." (*Id.* at 6-7.) Dr. Charbonneau's concern was based on a notation that Sanders's treadmill test was stopped due to "fatigue." (Dkt. 51 at 7.) The parties agree that Sanders eventually addressed and resolved all of Union Pacific's health concerns except Dr. Charbonneau's concern about his aerobic capacity. (*Id.*) The parties further agree that the only issue preventing his return to work was Sanders's unsatisfactory Bruce protocol results. (*Id.*)

Dr. Charbonneau determined that, taking into consideration the need for heavy lifting with walking, use of heavy tools, and environmental conditions, Sanders did not have the aerobic fitness to sustain the level of work required by his job. (Dkt. 51 at 7.) He referred to "a risk of a precipitous cardiovascular event" in connection with Sanders's demonstrated fatigue. (*Id.*) In April 2019, Dr. Charbonneau completed the fitness for duty review and released Sanders to work with the following restrictions: "Not to perform work involving more than light physical exertion (as defined by US Dept. of Labor), not to lift over 10 pounds frequently or 20 pounds occasionally. Most appropriate for office jobs or similar work only. Not to perform prolonged work in conditions of high heat and humidity, or excessive cold." (*Id.*) Dr. Charbonneau told Sanders that his "primary concern" was "the fact that [Sanders] had a cardiac arrest and that the most recent exercise tolerance testing results showed that his aerobic capacity [was] inadequate for his job activities." (*Id.*)

Dr. John Holland, Union Pacific's Chief Medical Officer at the time, approved the medical restrictions issued to Sanders. (Dkt. 51 at 7.) Neither Dr. Charbonneau nor Dr. Holland consulted a cardiologist. (*Id.*) The record shows that although Dr. Charbonneau made the initial decision, Dr. Holland made the ultimate decision. (*Id.*)

Union Pacific's Health and Medical Department sent Sanders's medical restrictions to General Superintendent Daniel Torres. (Dkt. 51 at 8.) Torres determined that Sanders could not perform the essential functions of his job with those medical restrictions and that he could not be reasonably accommodated. (*Id.*) Sanders did not request an accommodation because Union Pacific told him the restrictions could not be accommodated. (*Id.*) Torres neither worked with Sanders nor talked to Sanders about Sanders's job. (*Id.*) Torres later realized that Sanders was no longer under

his supervision, but was supervised by Kelli Dunn. (*Id.*) Ms. Dunn then signed Sanders's medical

restriction form and Sanders was informed of these medical restrictions on April 15, 2019. (*Id.*)

Bohner's independent medical expert Dr. Kevin Trangle, a board-certified environmental

medicine, internal medicine, and occupational medicine physician, testified that "[t]here's no

evidence that [Sanders] had a cardiac condition of any sort." (Dkt. 51 at 8.) He explained as

follows:

> Q  [Y]ou've stated . . . that there was no valid reason for Dr. Holland or his staff to
> have questioned Mr. Sanders's cardiac function or exercise capacity or for
> requesting a stress test be done. Correct?
>
> A  Correct . . . . It's not necessary . . . . [I]n fact, it is less necessary to Mr. Sanders
> than the general population of employees at Union Pacific . . . . [H]e underwent
> more or less a cardiac stress test when he was in the hospital and became such
> hypovolemic loss of blood volume because of his big GI bleed. He had no
> cardiac ischemia. He had no cardiac muscle problems. He had no cardiac
> arrhythmia. In fact, he did very well with his cardiac. If anything, he showed that
> his heart was in better condition than anybody else at his age with his underlying
> issues could expect to be. So, no, there is no reason to even do a cardiac stress
> test.

(*Id.*) Dr. Trangle further testified that "[t]he fact that he had to be, quote, 'resuscitated,' unquote,

is because of his massive blood loss. It has nothing to do with his heart. His heart, in fact, did

extremely well." (*Id.*) He testified that  there was no indication for him having to go through a

Bruce protocol. (*Id.*)

In his report, Dr. Trangle noted that Dr. Charbonneau predicated his opinion solely on the

results of the cardiac stress test that Sanders had completed. (Dkt. 51 at 8.) He testified that Union

Pacific should not have relied on Sanders's stress test because "you cannot measure fitness for

duty while you're talking beta blockers. It's written in every protocol, in every guideline, and any

doctor that knows anything about medicine knows that." (*Id.*) Dr. Trangle also opines that the

restrictions Union Pacific ultimately placed on Sanders were unreasonable, stating "[t]here clearly is no basis in medical science for such a decision with these unnecessary restrictions." (*Id.*)

## A) SANDERS'S TREATING PHYSICIANS' TESTIMONY

Union Pacific moves the Court to exclude testimony from Dr. Nadine Aboul-Madg, Dr. William Nicholas, Dr. Charles Ro, and Dr. Jimmy Buller "that extends beyond their scope of treatment, observation, and diagnoses of Sanders" because they are Sanders's treating physicians and not retained experts for whom Sanders produced reports. (Dkt. 48 at 2-4.) The Court should deny this request.

The scope of Union Pacific's requested exclusion does not align with the law on the scope of a treating physician's testimony. A treating physician's testimony is limited only to "that which is **related** to and learned through actual treatment of the [patient], and which is based on his or her personal knowledge of the examination, diagnosis and treatment." *Poster v. Marriott Int'l, Inc.*, No. 8:04-cv-534, 2005 WL 8175919, at *1 (D. Neb. Oct. 25, 2005) (quoting *Starling v. Union Pacific R.R. Co.*, 203 F.R.D. 468, 477 (D. Kan. 2001)) (emphasis added and internal quotation marks omitted). In other words, a plaintiff cannot provide facts unknown to his or her treating doctor and then elicit opinions about those facts. *See*, *e.g.*, *id.* (quoting *Baker v. Taco Bell Corp.*, 163 F.R.D. 348, 349 (D. Colo. 1995) (explaining that a treating physician's expert opinion must be "based upon their personal knowledge of the treatment of the patient and not information acquired from outside sources for the purpose of giving an opinion in anticipation of trial")). As long as the treating physician's opinion "was formed during the course of the physician's treatment, and not in preparation for litigation," it is fully admissible. *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 833 (7th Cir. 2013)

Sanders does not intend to elicit testimony outside of the proper scope of treating-physician testimony as defined in *Poster*. He will not elicit opinion testimony from his treating doctors based on anything unknown to them when they treated him. Nor does he intend to elicit testimony about any opinion developed in the course of litigation. Indeed, he intends to ask them about their examinations of Sanders, why they examined him the way they did when determining whether his conditions warranted restrictions, the conclusions they drew from those examinations, and whether there were other reasonable conclusions they might have drawn.

Union Pacific insists that certain testimony of Sanders's treating physicians extends past this purview, including their opinions on (1) the reasonableness of the medical restrictions Union Pacific imposed on Sanders, (2) the reasonableness of Union Pacific's fitness-for-duty evaluation of Sanders, and (3) whether Sanders's health conditions precluded him from performing his job duties as a foreman general in the car department at Union Pacific. (Dkt. 48 at 2-3.) Union Pacific is wrong. This testimony is well within the scope of what treating physicians may testify about.

Each of Sanders's treating physicians examined him to determine whether he needed work restrictions and found that he did not. Such examinations and determinations are obviously "related" to the reasonableness of issuing restrictions against Sanders, Union Pacific's fitness-for-duty evaluation, and whether Sanders's conditions prevent him from safely doing his job. Sanders expects his treating doctors will testify about how and why they examined him in the manner they did, and why they determined from such examination that he could return to work without restrictions. They do not need to be intimately familiar with every one of Sanders's job duties in order to determine his medical limitations and, thus, his appropriate work restrictions. And, since Sanders's treating physicians evaluated and determined the specific scope of his work restrictions based on facts provided **at the time of his examination**, rather than in the course of litigation,

their opinions about whether Sanders could perform the job duties of a foreman general simply asks them to apply their personal knowledge of the patient's treatment to a hypothetical. Sanders will not offer his treating physicians' opinion as to what his job duties actually **were**. Rather, he will ask only for their opinions on whether, based on their contemporaneous evaluations of Sanders and no additional facts, Sanders could or could perform particular hypothetical job duties. And, Sanders will elicit testimony on their medical basis for their particular examination methods, and why these methods (such as an in-person evaluation) were both reasonable and necessary to accurately assess Sanders's health condition. His treating physicians can also accordingly opine, based on their personal experience and contemporaneous knowledge rather than evidence or facts acquired in litigation, that assessing Sanders work restrictions without examining Sanders in person would have been unreasonable.

Moreover, it also does not matter whether Sanders's treating physicians knew exactly what he did at Union Pacific because they found that his conditions warranted **no restrictions**. That means he could perform **any** job for which he was otherwise qualified—including his job with Union Pacific. Sanders' physicians should be allowed to testify to how and why they examined him in the manner they did, why they found his conditions warranted no restrictions, why that meant he could perform any and all other job duties without medical concerns, and whether examining him in a different manner and/or reaching different conclusions would have been reasonable. Insofar as Union Pacific's motion seeks to exclude such testimony, it should be denied.

## B) THE CONDITION OF SANDERS'S HEART AFTER HIS EFFECTIVE TERMINATION

Union Pacific argues that only its initial decision to prohibit Sanders from returning to work is at issue in this case and asks that evidence of him being in good health thereafter be excluded. (Dkt. 48 at 4.) The Court should refuse Union Pacific's request for three reasons: (1)

hindsight evidence is not inadmissible per se and may be admitted where, as here, it is highly relevant; (2) even if hindsight evidence were inadmissible, evidence of Sanders being in good health is not hindsight evidence; and (3) Union Pacific cannot simultaneously seek to exclude purported "hindsight evidence" that helps Sanders while simultaneously seeking to admit hindsight evidence that supports its direct threat defense.

1) **Hindsight evidence is not inadmissible per se.**

Union Pacific argues that Sanders's purported hindsight evidence is irrelevant for no reason other than that it is hindsight evidence. Hindsight evidence, however, is not irrelevant per se. This is supported by the plain language of Rule 401 of the Rules of Evidence, as well as the decisions of courts in analogous cases.

Evidence that "has any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence" is relevant. Fed. R. Evid. 401. And relevant evidence is admissible absent an enumerated exception. Fed. R. Evid. 402.

Sanders seeks to admit evidence that Sanders has never lost consciousness since being held out of service. Since evidence of Sanders not having lost consciousness makes it more likely that his experts have been right, the evidence is admissible. First, though Union Pacific is technically correct that "Sanders's post-April 15, 2019 health status was not available to Union Pacific" at the time it initially imposed his medical restrictions, a reasonable jury could certainly find that evidence of his health status after April 15, 2019 is relevant to what his health status actually was at the time Union Pacific held him out of service, and also relevant to whether further pursuit of reasonable accommodations—which were preemptively closed off by Union Pacific—might have been effective. Union Pacific held Sanders out of service based on a purported risk assessment and its own conclusion that he was at risk of certain negative health events; whether

those risks or health events every came to be, then, is obviously relevant. To prove the point, consider the reasonableness of a meteorologist having opined that a certain weather system will likely become a hurricane. The fact that the weather system never in fact became a hurricane or even a tropical storm, while not necessarily dispositive, certainly makes it much more probable that the meteorologist's opinion was unreasonable.

The same is true about Sanders not having lost consciousness. Union Pacific argues that it was entitled to discriminate against Sanders because his purportedly bad heart causes him to be at an unacceptably high risk of suddenly losing consciousness. Sanders's treating doctors and an independent medical expert have, however, testified to exactly the opposite: that the risk of suddenly losing consciousness has been no greater for Sanders than anyone else. And Sanders not having suddenly lost consciousness since Union Pacific first prohibited him from returning to service makes it more likely that Sanders's experts have been right. Indeed, if Sanders had later suffered instances of loss of consciousness, Union Pacific would be clamoring to admit it, and surely the admission of such evidence would not be excluded on irrelevance grounds.

The admissibility of Sanders's evidence that he never lost consciousness after Union Pacific held him out of service is also supported by the decisions of courts in analogous cases. For example, in the Supreme Court's decision in *McKennon v. Nashville Banner Publishing Co.*, an ADEA case, the Court held that after-acquired evidence is not admissible for purposes of proving a party's state of mind at the time the decision was made, which makes sense because the party necessarily could not have considered it at that time, but is admissible for other purposes. 513 U.S. 352 (1995).

In any case, the question of relevance depends on context. Here—unlike in many other cases involving after-acquired evidence—the evidence Sanders seeks to offer relates directly to

the reason Union Pacific discriminated against him. For that reason, although the after-acquired evidence of Sanders's health condition is irrelevant to establishing Union Pacific's state of mind at the time the decision was made, it is relevant to bolster and impeach the credibility of witnesses as to whether that state of mind was reasonable,  *See McKennon*, 513 U.S. 532 (holding that after-acquired evidence may be relevant for proving certain matters other than discriminatory motive).

In another analogous case, *M.S. ex rel. Simchick v. Fairfax County Sch. Board*, 553 F.3d 315, 327 (4th Cir. 2009), a student alleged that he had wrongfully been denied an individual education plan, in violation of the Individuals with Disabilities Education Act. Determining whether the law had been violated necessitated the court first determining whether the reasonableness of a decision to deny a student an individualized education plan is viewed in light of the events that transpired after the denial. *Id.* at *326-27. The *Simchick* court correctly "concluded that, in some situations, evidence of actual progress may be relevant to a determination of whether a challenged [plan] was reasonably calculated to confer some educational benefit." *Id.* at 327.

The logic underpinning the *Simchick* court's decision had previously been explained by the Fourth Circuit:

> [I]n these cases, the courts should endeavor to rely upon objective factors, such as actual educational progress, in order to avoid substitut[ing] [our] own notions of sound educational policy for those of the school authorities which [we] review.

*MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 532-33 (4th Cir. 2002) (quoting *Hartmann v. Loudoun County Bd. of Educ.,* 118 F.3d 996, 1000 (4th Cir.1997) (some alteration in *MM ex rel. DM*).

The Fourth Circuit's logic is persuasive, especially when one considers that "a trial is a search for truth." *Mason v. Safeco Ins. Co. of Am.*, No. 4:09-cv-1081, 2010 WL 5070723, at *4

(E.D. Mo. Dec. 6, 2010) (quoting *Nix v. Whiteside,* 475 U.S. 157, 166 (1986)) (internal quotation marks omitted). The truth is that Sanders has not suffered from the bouts of suddenly losing consciousness Union Pacific predicted. The jury has a right to know as much.

**2)  Sanders has alleged a continuing violation.**

When an employer concludes that an employee's disability causes him or her to be a direct threat, the employer usually terminates the employee. Here, on the other hand, Union Pacific's collective bargaining agreement with Sanders's union entitles Sanders to take medical leave for as long as necessary. Union Pacific therefore did not terminate (and could not have terminated) Sanders due to his medical condition. Instead, Union Pacific placed Sanders on medical leave, where he will remain indefinitely until Union Pacific no longer purportedly believes he is a direct threat, at which point Union Pacific would have to allow him to return to work.

The continuing-violation nature of Sanders's allegation shifts the paradigm. Unlike in most cases, the jury will not be tasked with deciding whether an employer reasonably concluded on a particular date that an employee's disability caused him or her to be a direct threat. Rather, the jury will be tasked with determining whether Union Pacific reasonably concluded that Sanders was a direct threat on every day since it first prohibited him from returning to work. *See*, *e.g.*, *Benson v. City of Lincoln*, No. 4:18-cv-3127, 2019 WL 1766159, at *16 (D. Neb. Apr. 22, 2019).

Proving that it reasonably concluded that Sanders has been a direct threat for every day since it first prohibited him from returning to service necessitates that Union Pacific demonstrate that it relied on the best evidence in continuing to hold him out of service. The best evidence includes Sanders's actual medical condition. *See*, *e.g.*, *Denoewer v. Union Cty. Indus.*, No. 2:17-cv-660, 2020 WL 1244194, at *6 (S.D. Ohio Mar. 16, 2020). It follows that evidence of Sanders's

health after when Union Pacific first prohibited him from returning to service is not only relevant but also something Union Pacific must prove it has considered.

**3) Union Pacific unfairly seeks to exclude only <u>Sanders's</u> hindsight evidence.**

Union Pacific intends to argue that conditions other than Sanders's heart prevent him from safely doing his job even though its medical director disavowed anything else having played a role in his decision to effectively terminate Sanders. (Dkt. 53 at 3.) Union Pacific has also included in its exhibit list excerpts from Sanders medical records that post-date its initial decision to hold him out of service and that were obtained only through discovery in this case. The takeaway is that Union Pacific has no problem using after-the-fact evidence so long as such evidence is to its benefit.

Union Pacific cannot have it both ways, arguing that it can use after-the-fact evidence to show that its decision was reasonable but that Sanders cannot use the same type of evidence to show the opposite. "[W]hat is good for the goose is good for the gander." *MBI Energy Servs. v. Hoch*, 929 F.3d 506, 511 (8th Cir.), *cert. denied*, 140 S. Ct. 541 (2019) (quoting *CIGNA Corp. v. Amara*, 563 U.S. 421, 437 (2011)) (internal quotation marks omitted). If Plaintiff's after-acquired medical evidence is out, so must be Union Pacific's. Indeed, if the Court excludes any after-acquired evidence, it should be Defendant's. The after-acquired medical evidence Union Pacific seeks to offer concern unrelated health conditions, and it therefore bears no relationship to the discriminatory reason for which Sanders was fired. Plaintiff's evidence that he never lost consciousness, however, is directly related to Union Pacific's reason for terminating him: a perceived heart condition.

It would be unfair for the Court to allow Union Pacific's after-acquired evidence and exclude Plaintiff's. Accordingly, Union Pacific's motion in limine on this issue should be denied.

## C)  IN-PERSON EXAMINATION

Union Pacific seeks to preclude Sanders from making legitimate arguments at trial about whether its failure to conduct an in-person examination was reasonable. (Dkt. 48 at 5-6.) While the ADA does not necessarily mandate an in-person examination, it can, depending on the circumstances. Whether those circumstances exist here is for the jury to decide.

Union Pacific does not dispute that it has refused to allow Sanders to return to work because of his supposedly bad heart; rather, Union Pacific argues that it was entitled to discriminate against Sanders on this basis because his supposedly bad heart purportedly causes him to be at an unacceptably high risk of suddenly losing consciousness, which Union Pacific says is likely to result in him seriously injuring himself or others. This is an affirmative defense, known as the direct-threat defense. *See*, *e.g.*, *Hopman v. Union Pac. R.R.*, No. 4:18-cv-00074, 2020 WL 5740539, at *4 (E.D. Ark. Sept. 24, 2020). An employer asserting the defense must prove that it conducted an individual analysis that "relied on the best current medical or other objective evidence." *Id.* (quoting *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007)) (internal quotation marks omitted). Whether this includes an in-person examination is for the jury to decide, especially since Union Pacific requires in person examinations when determining whether to hire someone. *See*, *e.g.*, *Campbell v. Union Pac. R.R. Co.*, No. 4:18-cv-00522, 2020 WL 5300734, at *1 (D. Idaho Sept. 4, 2020).

That the best evidence may include an in-person examination is supported by caselaw. In *Ferrari v. Ford Motor Co.*, for example, the district court wrote the following:

> An inquiry meets this [individualized-inquiry] requirement if the examining doctor is familiar with the relevant job duties, obtains individualized information about the employee's medical condition, has current knowledge of the employee's medical condition, **examines the employee in person**, and reviews the records of the employee's other treating physicians.

96 F. Supp. 3d 668, 676 (E.D. Mich. 2015), *aff'd*, 826 F.3d 885 (6th Cir. 2016) (emphasis added). The *Ferrari* court then found that the employer in that case had satisfied the individual-inquiry requirement because it had twice examined the plaintiff in person. *Id.* at 676-77. The *Ferrari* court distinguished the caselaw on which the plaintiff relied, noting that the employer in those case had not conducted an in-person examination. *Id.*

There being circumstances in which the best evidence may include an in-person examination is also supported by the ADA's purpose. As explained by the Southern District of Ohio:

> [The individual-inquiry] requirement flows from the ADA's underlying objective to prevent discrimination against disabled individuals on the basis of unfounded fear, prejudice, ignorance, or mythologies and to require employers to act, not based on stereotypes and generalizations about a disability, but based on the actual disability and the effect that disability has on the particular individual's ability to perform the job. As part of this individualized inquiry, the employer is required to consider the applicant's personal characteristics, his actual medical condition, and the effect, if any, the condition may have on his ability to perform the job in question.

*Denoewer v. Union Cty. Indus.*, No. 2:17-cv-660, 2020 WL 1244194, at *6 (S.D. Ohio Mar. 16, 2020) (quoting *Keith v. Cty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013)) (internal quotation marks omitted).

Sanders's experts' testimony in this case will call into question whether Union Pacific should have examined him in person. Consequently, this is an issue for the jury to decide:

> [T]he trial judge's role, as it relates to determining whether the elements essential to a [claim] have been established, is extremely limited; he instructs the jury on the law applicable to the issues raised at trial. The next two steps are for the jury. The jury first *determines* the facts, then it *applies* the law to those facts. Thus, when the judge is no longer deciding the law that applies to the evidence, but rather is applying the law to the facts—facts that are determined after assessing the probative value of evidence introduced at trial—the judge has invaded the jury's province.

*United States v. White Horse*, 807 F.2d 1426, 1430 (8th Cir. 1986).

### D)  REASONABLE ACCOMMODATION

Union Pacific argues that "[t]he Court should preclude Sanders from offering evidence or making arguments about possible accommodations that he believes would have allowed him to safely perform his job because Sanders never asked Union Pacific for an accommodation." (Dkt. 48 at 6-7.) The Court has already rejected this argument:

> The court finds there is also a triable issue of fact on the reasonable accommodation issue. The plaintiff essentially contends it would have been futile to ask for accommodations when the Railroad had told him no accommodations were possible. There is evidence that suggests that U.P. did not engage in any interactive process. Union Pacific has not met the burden of establishing as a matter of law that the plaintiff has no reasonable accommodation claim. The issue requires further factual development. Depending on the evidence as to the job's essential functions, the plaintiff's limitations, and the information conveyed to the plaintiff, a reasonable finder of fact could conclude the plaintiff has a claim for denial of a reasonable accommodation.

(Dkt. 51 at 16-17.) It was right to do so and should do so again. *See, e.g.*, *Davoll v. Webb*, 194 F.3d 1116, 1132-33 (10th Cir. 1999) (where employer forecloses reasonable-accommodations process through "its policies or explicit actions," futile-gesture doctrine relieves employee of need to request an accommodation); *Mlsna v. Union Pacific R.R. Co.*, 975 F.3d 629, (7th Cir. 2020) ("A proposed accommodation is not limited to what the plaintiff introduced into the process." (citation omitted)).

The Court would be right to reject Union Pacific's argument also for a second reason. The availability of a reasonable accommodation is not only part of Sanders's reasonable-accommodation claim but also relevant to the qualified element of his disparate treatment claim and Union Pacific's direct threat defense to that claim. *See* 42 U.S.C. §§ 12111(8) (defining "qualified individual"), 12113(a)-(b) (direct threat defense). Union Pacific's motion in limine is therefore, for all intents and purposes, a dispositive motion. And "[p]roper *limine* practice is not a

second bite at the dispositive apple." *See*, *e.g.*, *Infernal Tech., LLC v. Sony Interactive Entm't LLC*, No. 2:19-cv-00248, 2021 WL 405813, at *6 (E.D. Tex. Feb. 3, 2021).

### E) OTHER LAWSUITS

Union Pacific has moved to exclude evidence of the numerous other ADA complaints that have been filed against it. (Dkt. 48 at 7-9.) It is worth noting that this evidence is relevant to punitive damages. *See*, *e.g.*, *United States v. Space Hunters, Inc.*, 429 F.3d 416, 428 (2d Cir. 2005); *Weber v. Wells Fargo Bank, N.A.*, No. 3:13-cv-158, 2014 WL 1618378, at *1 (N.D.W. Va. Apr. 22, 2014) ("[O]ther claims and lawsuits might be relevant under certain circumstances where punitive damages are at issue . . . .") That being said, Sanders does not intend to introduce evidence of the other complaints unless Union Pacific opens the door. For example, if Union Pacific introduces evidence of its anti-discrimination policies, it is then fair game for Sanders to point out that those policies aren't worth the paper on which they're printed, as evidenced by jury after jury finding that Union Pacific has violated the ADA. *See*, *e.g.*, *Weatherly v. Ala. State Univ.*, No. 2:10-cv-192, 2012 U.S. Dist. LEXIS 14308, at *6-7 (M.D. Ala. Feb. 7, 2012).

### F) UNION PACIFIC ADOPTING MEDICAL REGULATIONS AFTER THE FRA REFUSED TO DO THE SAME

Union Pacific moves the Court to exclude testimony regarding Union Pacific having lobbied the Federal Railroad Administration ("FRA") to adopt what later became Union Pacific's medical regulations. (Dkt. 48 at 9-10.) At the same time, Union Pacific wants to argue that the railroad is a dangerous workplace and that its medical policies have been adopted for the benefit of its employees. Again, Union Pacific cannot have it both ways. If it wants to argue to the jury that it adopted its medical policies for a benevolent purpose, it's only fair for Sanders to be allowed to tell the jury the truth—that the FRA, which is the government agency responsible for enacting safety measures, refused to adopt the same policies because it feared railroads would do exactly

what Union Pacific has done: use the policies to effectively terminate disabled, elderly, and higher-paid employees of whom it wants to be rid.[1]

## G) SANDERS'S SUBJECTIVE BELIEF ABOUT UNION PACIFIC'S DISCRIMINATORY ANIMUS

Union Pacific argues that Sanders should be prevented from offering his personal opinion regarding discriminatory animus. (Dkt. 48 at 10-11.) Sanders does not intend to offer any such testimony. The facts speak for themselves.

## H) PRETRIAL MATTERS

Union Pacific moves the Court to exclude reference to pretrial matters. (Dkt. 48 at 11.) Sanders does not intend to offer any such testimony. But if Union Pacific opens the door by, for example, changing its position on why it effectively terminated Sanders, this change would be evidence of discrimination that would then cause the pretrial matters to be relevant and admissible.

## I) WITNESSES' OPINIONS REGARDING WHETHER SANDERS WAS TREATED UNFAIRLY OR ILLEGALLY

Union Pacific argues that Sanders should be prevented from eliciting witnesses' opinions regarding whether he was discriminated against and/or treated unfairly. (Dkt. 48 at 11-12.) Sanders intends to offer no such testimony. The facts speak for themselves.


October 14, 2021

**COUNSEL FOR PLAINTIFF**

/s/ Nicholas D. Thompson
Nicholas D. Thompson (MN389609)
Casey Jones Law
3520 Cherryvale Avenue, Suite 83
Appleton, WI 54912
Phone: (757) 477-0991
Email: nthompson@moodyrrlaw.com

---

[1] Union Pacific also argues that Sanders does not have foundation to provide such testimony. True. But his other witnesses do, and it is through them that such testimony will be offered.