IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

Allan Sanders,

        Plaintiff,

    v.

Union Pacific Railroad Co.,

        Defendant.

Case No. 4:20-cv-03023-JFB-SMB

**PLAINTIFF ALLAN SANDERS'S BRIEF IN SUPPORT OF HIS MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(a)**

## <u>INTRODUCTION</u>

Plaintiff Allan Sanders moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). For the reasons set forth below, no reasonable jury could find in Union Pacific's favor on Sanders's claims for disparate treatment and reasonable accommodation under the Americans with Disabilities Act ("ADA"), or in Union Pacific's favor on its direct-threat, business-necessity, or good-faith defenses. Sanders is also entitled to judgment as a matter of law on his claims for compensatory damages, back pay, reinstatement or front pay in lieu of reinstatement, and punitive damages.

## <u>LEGAL STANDARD</u>

Rule 50(a)(1) provides courts with the authority to grant parties judgment as a matter of law. That rule states:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1).

Rule 50 "allows the trial court to remove cases or issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result." *Weisgram v. Marley Co.*, 528 U.S. 440, 448 (2000) (internal quotations omitted). Courts apply the same standards to Rule 50 motions for judgment as a matter of law that they apply to Rule 56 motions for summary judgment. *Kinserlow v. CMI Corp.*, 217 F.3d 1021, 1025 (8th Cir. 2000). In considering a motion for judgment as a matter of law, "the court views the evidence in the light most favorable to the nonmoving party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility." *Id.* (cleaned up). That said, "the nonmoving party is only entitled to the benefit of reasonable inferences." *Id.* at 1026. "When…both parties have had an opportunity to adduce all relevant, available evidence so that the trial court is no longer uncertain as to the circumstances of the case, then slight doubt as to the facts is insufficient to avert a directed verdict or a judgment notwithstanding the verdict." *Armco Steel Corp. v. Realty Inv. Co.,* 273 F.2d 483, 485 (8th Cir. 1960).

## ARGUMENT

Sanders is entitled to judgment as a matter of law on his claims for disparate treatment and reasonable accommodation under the ADA, and on Union Pacific's direct-threat, business-necessity, and good-faith defenses. Sanders is also entitled to judgment as a matter of law on his claims for compensatory damages, back pay, reinstatement or front pay in lieu of reinstatement, and punitive damages.

### I.   Sanders Is Entitled to Judgment as a Matter of Law on His ADA Disparate-Treatment Claim.

Sanders moves for judgment as a matter of law on his claim for disparate treatment under the ADA. The evidence presented at trial clearly and unequivocally establishes that Union Pacific

2

violated the ADA, 42 U.S.C. § 12112, when it refused to let Sanders return to work after his medical leave because of his disability. To succeed on a claim for disparate treatment under the ADA, Sanders must prove three things by a preponderance of the evidence: (1) Sanders had a disability; (2) Sanders was qualified to perform his job; and (3) Union Pacific took adverse action against Sanders because of his disability. *Id.*; *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). Sanders has proven all three things.

### A.      Sanders Was Disabled Within the Meaning of the ADA.

Sanders meets all three definitions of "disabled" under the ADA. *See* 42 U.S.C. § 12102(1). First, he was actually disabled because he had "a physical … impairment that substantially limits one or more of [his] major life activities." *Id.* § 12102(1)(A); *see also* 29 C.F.R. § 1630.2(g)(1)(i). Second, because his medical records document these impairments, he had "a record of such impairment." 42 U.S.C. § 12102(1)(B); *see also* 29 C.F.R. § 1630.2(g)(1)(ii). Finally, he was "regarded as" disabled under 42 U.S.C. § 12102(1)(C), since Union Pacific admits that it effectively terminated him because of his perceived physical condition. 29 C.F.R. § 1630.2(g)(1)(iii); *id.* § 1630.2 (l)(1) (an individual is disabled under § 12102(1)(C)'s "regarded as" prong "if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity").

### 1.      Sanders Had an Actual Physical Impairment that Substantially Limited One or More of His Major Life Activities.

Sanders is entitled to judgment as a matter of law as to whether he had "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(1)(A). He proved several substantially-limiting physical impairments at trial, and Union Pacific's evidence did not rebut this proof sufficiently—or at all.

3

Under the ADA's definition of "disability," "substantially limits" is not a demanding standard. 29 C.F.R. § 1630.2(j)(1)(i). An impairment is a disability if it limits a major life activity compared to "most people in the general population." *Id.* § 1630.2(j)(1)(ii). "An impairment need not prevent, or [even] significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). They also include "the operation of a major bodily function," such as a person's circulatory, gastroenterological, and cardiovascular functions. *See id.* § 12102(2)(B).

"The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures," such as "medication" or "reasonable accommodations." *Id.* § 12102(4)(E)(i). Temporary impairments count as disabilities "if sufficiently severe"—i.e., if they substantially limit a major life activity. 29 C.F.R. Pt. 1630, App.; *accord Miller v. Coca-Cola Refreshments USA, Inc.*, No. 2:16CV93, 2018 WL 1456502, at *11 (W.D. Pa. Mar. 23, 2018).

Given the evidence at trial, any reasonable jury would find that Sanders has or had several physical impairments that substantially limit his major life activities.

First, Sanders presented evidence that his gastrointestinal bleed resulted in surgery and severe complications, including, among other things, cardiac arrest, kidney failure, and hypotension. The gastrointestinal bleed and other complications resulted in him being unable to work or live normally for approximately two months (from late June until late August 2018).

4

Sanders also presented evidence that Union Pacific knew of these problems. There's no question, then, that Sanders had a "physical impairment" that meets the ADA's definition of "disability."

Second, Sanders also suffers from hypertension. With medication, his hypertension is under control; however, his medication itself can cause interference with his ability to perform an accurate treadmill-stress test—something which Union Pacific somehow claims is a requirement of his job. Regardless of the fact that his hypertension is controlled by medication, it also meets the definition of "disability." *See* 42 U.S.C. § 12102(4)(E)(i).

Third, Sanders also suffers from a knee impairment and back problems that somewhat limit his ability to run, walk, lift, stand, and bend—which are also major life activities. *See*, *e.g.*, *Heard v. City of Union City, Georgia*, No. 1:15-cv-2228, 2017 WL 4334243, at *8 (N.D. Ga. May 23, 2017) (running), *report and recommendation adopted*, No. 1:15-cv-2228, 2017 WL 4475926 (N.D. Ga. July 25, 2017); *Bonzani v. Shineski*, No. 2:11-CV-0007-EFB, 2013 WL 5486808, at *7 (E.D. Cal. Sept. 30, 2013) (running and squatting); *Farina v. Branford Bd. of Educ.*, No. 3:09-CV-49 JCH, 2010 WL 3829160, at *11 (D. Conn. Sept. 23, 2010), *aff'd,* 458 F. App'x 13 (2d Cir. 2011) ("[E]ven a relatively minor lifting restriction could qualify as a disability within the statute.").

2.   <u>Sanders Had a Record of Impairment.</u>

During the time Union Pacific refused to return him to service, Sanders had a record of all of the above impairments. These records were provided to Union Pacific, so there is no question that Union Pacific knew of them. *See, e.g.*, Pl.'s Trial Exs. 3, 23. Accordingly, even though some of the above impairments (like his GI bleed and cardiac arrest) eventually resolved, Sanders independently meets the definition of "disabled" under 42 U.S.C. § 1630.2(g)(1)(ii).

3.    Union Pacific Regarded Sanders as Disabled.

Regardless of whether Sanders is actually disabled, there is no question that Union Pacific regarded him as disabled. "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

Union Pacific's Associate Medical Director, Dr. John Charbonneau, who imposed restrictions on Sanders, stated that Sanders was not fit for duty because of the complications from his GI bleed and the results of his treadmill-exercise test (and what those results allegedly said about his heart and aerobic capacity). Pl.'s Trial Ex. 20. Accordingly, Union Pacific subjected Sanders to an adverse action "because of an actual or perceived physical or mental impairment"—meaning Sanders is "disabled" under the ADA regardless of whether any of his impairments substantially limit a major life activity. *See* 42 U.S.C. § 12102(3)(A).

**B.    Sanders Was Qualified to Perform His Job.**

Given the evidence at trial, no reasonable jury could find that Sanders was unqualified to perform his job.

The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Whether an individual is qualified within the meaning of the ADA is determined by applying a two-part test." *Henningsen v. City of Blue Earth*, 184 F. Supp. 3d 710, 720 (D. Minn. 2016) (quoting *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 845 (8th Cir. 2015) (internal quotation marks omitted)). "The first inquiry is whether [the employee] possesses the requisite skills, education, certification or experience necessary for the

6

job." *Id.* (quoting *EEOC v. Wal-Mart*, 477 F.3d 561, 568-69 (8th Cir. 2007) (internal quotation marks omitted)). "The second part asks whether [the employee] 'can, despite [his] impairments, perform the essential functions of the job either with or without reasonable accommodation.'" *Id.* (second alteration in original) (quoting *EEOC*, 477 F.3d at 568-69). Essential functions are the "fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1).

After working for Union Pacific for more than 40 years, Sanders unquestionably had the skills, experience, and other requirements for his job. The jury heard testimony that he performed his job capably. The jury also saw medical records and heard testimony from Sanders's physicians and occupational health expert, all of which demonstrate that he was—and is—healthy enough to perform the essential functions of his job. That evidence showed that his cardiovascular functioning was within normal range. Moreover, to the extent that Union Pacific argues that his health disqualified him because it posed a danger to him or to others, any such safety concerns are relevant only to Union Pacific's affirmative defense and may not be considered with regard to whether he is qualified for the job. *EEOC*, 477 F.3d at 571-72; ECF No. 51, at 13.

Sanders has shown what his essential functions were and that he had the ability to do them, even after returning from medical leave. The jury heard testimony that Sanders was a non-working foreman in the car department whose essential functions included overseeing a small workgroup, which entailed things like conducting safety meetings, ordering material, and stocking and inventorying material. When a train broke down and a carman was not available, Sanders went to it and tried to get the train back up and running. But his work mostly involved computer and other non-manual work. Sanders had to lift heavy objects only rarely and he could enlist the assistance of carmen or members of the train crew.

By contrast, Union Pacific has not offered adequate evidence that Sanders could not do the essential functions of his job. Union Pacific argues that Sanders could not do heavy lifting, use heavy tools, or work in extreme heat or cold. Union Pacific says that it believed he couldn't do these things because of his heart or aerobic capacity. But the evidence shows just the opposite: Sanders can do those things because there is nothing wrong with his heart or aerobic capacity, or his ability to do lifting. In fact, Sanders testified that he is an active cattle rancher, which is far more physically demanding than his work at Union Pacific was. Moreover, Sanders testified he was not required to lift heavy objects like knuckles[1] and that, at any rate, his heart condition and aerobic capacity did not prevent him from lifting heavy objects. His treating doctors agree, as their trial testimony and return-to-work letter show.

The testimony and exhibits offered at trial would not support a finding that any other health condition prevented him from being able to perform his essential functions, either.

Sanders has also shown through testimony that many of the things that Union Pacific says were essential functions—like lifting knuckles—were not actually "fundamental job duties"—or even among Sanders's job duties at all—and could have been (and were) performed by others. *See* 29 C.F.R. § 1630.2(n)(1). Non-essential functions like this can be waived as part of a reasonable accommodation. *See U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1284 (7th Cir. 1995) ("The ADA defines 'reasonable accommodation' to include restructuring a job, such as by removing non-essential functions from the job." (citing 42 U.S.C. § 12111(9)(B))); *see also* 29 C.F.R. § 1630.2(o).

---

[1] Knuckles fit into railcar couplers and rotate between "open" and "closed" around a vertical pin, thereby allowing railcars to be coupled and uncoupled through that rotation mechanism.

The jury also heard evidence that would support a finding—and no other finding—that any running or walking restrictions that Sanders had because of his knee could have easily been accommodated, because he did not have to run or walk rapidly up hills for his job. And as for any weather or temperature restrictions, those also could have been accommodated (if they even needed to be, which they did not)—for example, through breaks, cooling packs, and warm-weather clothing.

There is no question that Sanders could have performed the essential functions of his job, either with or without an accommodation. Considering the evidence that the parties presented, no reasonable jury could find that Sanders was not qualified to perform his job.

### C.   Union Pacific Refused to Let Sanders Return to Work Because of His Disability.

The evidence at trial clearly demonstrates that Union Pacific took an adverse action against Sanders on the basis of "disability" as that term is defined in the ADA.

First, it is clear that Sanders was effectively terminated (a clear adverse action) "on the basis of" his actual disabilities relating to his GI bleed, cardiovascular issues, and other physical conditions. It is uncontroverted that Union Pacific initially refused to allow Sanders to return to work as a result of a fitness-for-duty evaluation it instigated as a result of his GI bleed and the subsequent hospital visit and heart and kidney complications. *See* Initial Jury Instructions, Jury Instruction No. 12, Uncontroverted Facts ¶¶ 6-7; Pl.'s Trial Exs. 9, 10, 15, 19, 20, 23. Because of this GI bleed and resulting cardiovascular complications, Union Pacific then demanded that Sanders complete a "Bruce protocol"—i.e. a treadmill stress test. Pl.'s Trial Ex. 20, at 3-7, 10. Union Pacific ultimately kept Sanders out of service because of the results of this treadmill stress test—a test he could not complete because of his knee, as he clearly explained to Union Pacific. *See id.* at 1-2.

9

Second, Union Pacific also refused to allow Sanders to return to work "on the basis of" his record of disability. *See* Exs. Pl.'s Tr. Exs. 9, 10, 15 (stating Sanders' work restrictions were based on "the review of medical documents" including his GI bleed, cardiovascular complications, and a misinterpretation of his treadmill stress-test results ("ETT measures 4.6 METS")).

Third, regardless of whether Sanders has or had an actual disability or record of such, there can be no dispute that Union Pacific refused to allow him to return to work because it perceived that he had a physical impairment. *See* Initial Jury Instructions, Jury Instruction No. 12, Uncontroverted Facts ¶¶ 6-10; Pl.'s Tr. Exs. 9, 10, 15, 19, 20, 23.

There can be no question that Sanders's disabilities, whether actual or perceived, motivated Union Pacific's adverse action, and no reasonable jury could find otherwise. Accordingly, the Court should grant Sanders's motion for judgment as a matter of law on his disparate-treatment claim under the ADA.

## II.   Sanders Is Entitled to Judgment as a Matter of Law on His ADA Failure-to-Accommodate Claim.

Sanders moves for judgment as a matter of law on his failure-to-accommodate claim. The evidence shows that no reasonable jury could find in favor of Union Pacific on this claim.

To establish his claim for failure to accommodate, Sanders must show that he was disabled (in the sense of having an actual disability or a record of disability) and qualified to do his job, and that Union Pacific failed to provide him a reasonable accommodation. 42 U.S.C. § 12112(b)(5); 29 C.F.R. § 1630.2(o)(4). Sanders has already established that he was disabled and qualified and that no reasonable jury could find otherwise, and he incorporates those arguments here by reference. *See supra* Part I.A-B.

Sanders has also proven that Union Pacific failed to provide him a reasonable accommodation. A "reasonable accommodation" may include a change in such things as: ordinary

work rules, facilities, conditions, or schedules; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations or policies; or restructuring a job, such as by removing non-essential functions from the job. *Id.* § 12111(9). However, it does not include elimination or change of essential job functions, assignment of essential job functions to other employees, or lower productivity standards than others performing the same job. *See E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 796 (8th Cir. 2007).

To determine what accommodations are necessary, the parties generally must engage in an "interactive process." This means that employers should analyze the relevant job and the specific limitations imposed by the disability and then, in consultation with the employee, identify potential effective accommodations. *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (8th Cir. 2000).

Before an employer must make an accommodation for the physical or mental limitation of an employee, the employer must have knowledge that such a limitation exists. Where the employer does not about know the employee's limitation, it is generally the responsibility of the plaintiff to request the provision of a reasonable accommodation. *See Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 689 (8th Cir. 1998). However, the plaintiff need not request an accommodation when the need for an accommodation is obvious or apparent to the employer, or when making such a request would be futile. *See Beveridge v. Nw. Airlines, Inc.*, 259 F. Supp. 2d 838, 853-56 (D. Minn. 2003); ECF No. 51, at 16-17.

Additionally, a plaintiff can prevail on a failure-to-accommodate claim by showing that he can perform the essential functions of his position with a reasonable accommodation, that the defendant did not cooperate in the interactive process, and that the defendant's failure to engage

in the process prevented the identification of a reasonable accommodation. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 292-93 (7th Cir. 2015).

Although an employer may not be held liable under the ADA for failing to engage in an interactive process if no reasonable accommodation was possible, the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is evidence that the employer may be acting in bad faith. *See Minnihan v. Mediacom Comms. Corp.*, 779 F.3d 803, 813 (8th Cir. 2015).

The evidence shows that Union Pacific did not cooperate in the interactive process in good faith and that its purported "job requirement" that Sanders complete a treadmill stress test that was not an essential function of the job and should have been waived.

Rather than cooperate in the interactive process, Union Pacific put up a brick wall that prevented discussion of accommodations. Sanders's testimony and Union Pacific's own records reveal that Sanders reached out to Union Pacific several times for assistance in returning to work. *See* Pl.'s Trial Ex. 20. Union Pacific repeatedly informed Sanders, multiple times in multiple ways, that no reasonable accommodation could be provided. *See, e.g.*, Pl.'s Trial Exs. 15, 16, 17, 19, 23; Pl.'s Trial Ex. 20, at 1-2. Accordingly, any request for accommodation would have been futile. *Beveridge*, 259 F. Supp. 2d at 853-56. Moreover, Union Pacific repeatedly frustrated Sanders in his attempts to resolve his return-to-work concerns. This, too, demonstrates futility. *Cf. Lockridge v. Bd. of Trustees of Univ. of Ark.*, 315 F.3d 1005, 1011 (8th Cir. 2003) ("[I]t might be that an employee's proven experience with an employer could, in a proper case, furnish a reason for relaxing the requirement that an employee must apply for a position in order to make out a *prima facie* case that he was unlawfully discriminated against.").

12

Nevertheless, Sanders persisted in seeking accommodations. On April 15, 2019, Union Pacific sent Sanders a letter imposing extremely limiting work restrictions and stating that he could not be accommodated in his current position. Pl.'s Trial Ex. 16. It asked him to contact HR if he believed some accommodation could be made. *Id.*

Sanders did so. The very next morning, he had a conference call with Union Pacific that included Dr. Charbonneau. Pl.'s Trial Ex. 20, at 1. He explained to Union Pacific and Dr. Charbonneau that his knee problem, rather than a heart condition, prevented him from completing the treadmill test. *Id*. Dr. Charbonneau—who was not a cardiologist—refused to believe Plaintiff or to follow up on Plaintiff's explanation. *Id.* Sanders asked Charbonneau to allow an alternative bicycle test—a request Charbonneau flatly refused. Sanders asked Union Pacific to consider the Lexiscan Cardiolite test or to waive the Bruce protocol treadmill-test requirement altogether. Union Pacific again refused.

If Dr. Charbonneau or Union Pacific's nurses believed Sanders was lying about his knee, they could have contacted the office that had performed the treadmill test and asked why Sanders had stopped the test and what the word "fatigue" in his records meant. They could have asked Plaintiff for a note from his doctor explaining why he had stopped the test. They could have followed up in any number of ways. Instead, Union Pacific continued to insist that Sanders complete a test that he could not complete because of his knee. *Id.* And this isn't the only reason why requiring Sanders to complete this test made no sense under the circumstances. The jury also heard evidence that medication that Sanders took could skew the test results, making those results unreliable and of limited, if any, value. This is simply one example of Union Pacific's conduct demonstrating its bad faith, which led to a breakdown in the interactive process.

13

It goes without saying that performing the treadmill stress test was not an essential function of Sanders's job as a foreman general, and accordingly, Union Pacific should have waived this purported "requirement" as part of a reasonable accommodation. Sanders specifically requested this—and requested consideration of alternative tests—but Union Pacific chose to disbelieve him rather than engage in the interactive process as required by law. Union Pacific could have let Sanders take or retake a different test instead of the treadmill test. There were several other tests available, such as a chemical stress test (which Sanders had already taken and that showed that he was perfectly fine), that would have shown that there was no reason to believe that he had any medical conditions that prohibited him from doing his job. Even if Union Pacific wanted information about his heart during exercise, it could have allowed a bicycle stress test. It refused.

Because Union Pacific cut off the discussion of accommodations and insisted that Sanders complete a test that was not actually a necessary component of his job duties, the interactive process broke down. Sanders could not pursue any number of other reasonable accommodations, such as job restructuring. With job restructuring, Union Pacific easily could have accommodated even its own excessive restrictions. As a foreman general, Sanders performed very little if any heavy lifting or exertion—instead, heavy lifting was performed, if at all, by other employees. Thus, heavy lifting was not an essential function or fundamental component of Sanders's job, and to the extent that Union Pacific believed it was a job requirement, it should have been waived.

Even Union Pacific's own unreasonable restrictions (which Union Pacific concocted and which had no medical or safety-related basis) could have been accommodated with reasonable low-cost measures. To the extent Sanders needed to exert himself or work in temperature extremes, Union Pacific could have provided breaks, cold packs, and warm-weather clothing to mitigate any perceived cardiac risks (which, again, Union Pacific imagined). The only reason these reasonable

accommodations were not pursued or considered is because of the above-described breakdown in the interactive process due to Union Pacific's bad-faith refusal to believe Sanders or follow up on the information he provided about the incomplete Bruce protocol treadmill test.

And it is no defense that Sanders suggested only some of these alternatives. An employer has an obligation to consider reasonable accommodations when the need to do so is obvious. *Wallin v. Minnesota Dep't of Corr.*, 153 F.3d 681, 689 (8th Cir. 1998). Union Pacific unquestionably failed to do so.

Given these incontrovertible facts, a reasonable jury would not have a basis to find for Union Pacific on Sanders's failure-to-accommodate claim. Sanders is thus entitled to judgment as a matter of law on it.

## III.   Sanders Is Entitled to Judgment as a Matter of Law on Union Pacific's Direct Threat Defense.

Sanders is entitled to judgment as a matter of law on Union Pacific's direct-threat defense. No reasonable jury would have a sufficient evidentiary basis to find that Union Pacific had proven this defense with regard to either Sanders's accommodation claim or his disparate-treatment claim.

To establish this defense, Union Pacific must prove that Sanders posed "a significant risk of substantial harm to the health or safety of [himself] or others that cannot be eliminated or reduced by reasonable accommodation." 42 U.S.C. § 12111(3); 29 C.F.R. § 1630.2(r). To meet this burden, "[t]he Supreme Court requires an individualized analysis that relies on the 'best current medical or other objective evidence' in order to protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear." *EEOC*, 477 F.3d at 571 (quoting *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1248 (9th Cir. 1999)); ECF No. 51, at 13. The defense "must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly

15

'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quoting 29 CFR § 1630.2(r)); ECF No. 51, at 13. In determining whether a person is a direct threat, the factfinder should consider the duration of the risk, the nature and severity of the potential harm, the likelihood that the potential harm will occur, and the imminence of the potential harm. 29 CFR § 1630.2(r).

Union Pacific cannot prove either of the elements necessary to its direct-threat defense, i.e., that Sanders posed a direct threat or that such a threat could not be eliminated or reduced by a reasonable accommodation.

As an initial matter, Union Pacific has admitted that all of its concerns about Sanders's health were resolved save one: its concerns about Sanders's cardiovascular health as measured by the Bruce protocol treadmill-stress test. Thus, the only question with regard to Union Pacific's direct-threat defense is whether Union Pacific's determination that Sanders's *cardiovascular capabilities* posed a danger to himself or others at work was based on a thorough "individualized assessment" and reflected "a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence." *Echazabal*, 536 U.S. at 86; *EEOC*, 477 F.3d at 571. It was not, and it did not.

Insurmountable evidence demonstrates that Union Pacific did not perform the individualized risk analysis that the Supreme Court requires. Instead Union Pacific based its determination entirely on narrow portions of Sanders's medical records while completely ignoring the additional details and context provided by Sanders or shown elsewhere in the records—specifically, the actual reason why he could not complete the treadmill test, his doctor's statement

that he had no restrictions, his use of beta blockers, and the results of the other stress test he had performed. The evidence presented at trial, including the testimony of Sanders and his doctors, demonstrates that Union Pacific's supposed risk determination relied entirely on the word "fatigue" in a cursory notation about the reason for an incomplete test—a note which was made by a technician and/or a non-treating doctor overseeing the test, rather than by Sanders's treating physicians. Def.'s Trial Ex. 113, at 3. The same note also explicitly states that the test was "inconclusive"—yet somehow Union Pacific argues it is adequate evidence of a dangerous heart condition. *Id.* Sanders has established through the testimony of his doctors and his expert, Dr. Kevin Trangle, that a cursory note by non-treating test-facility staff about why an inconclusive test was not completed is neither "the best available objective evidence"—nor really any evidence— of a patient's having a permanent, dangerous medical condition. Sanders has further established, and any reasonable jury would find, that this is particularly true where, as here, the patient's doctor has issued a return-to-work letter with no restrictions, where the patient himself offers a more detailed explanation for the technician's cursory notation, where the additional medical records and larger context established excellent heart health, and where the patient performed a subsequent chemical stress test demonstrating his ability to endure external stress. *Echazabal*, 536 U.S. at 86.

Sanders has shown that Dr. Charbonneau's interpretation of Plaintiff's treadmill-test results—that the test was stopped because of cardiovascular or aerobic "fatigue" that evidences a heart condition—was both inaccurate and unreasonable. This is unsurprising given that Dr. Charbonneau is not a cardiologist. Sanders has further shown that his own cardiologist knew (and that he would have informed Union Pacific, had it asked him) what the "fatigue" note actually meant—i.e., that the test was stopped because of a reason other than Sanders's heart. Nicholas Trial Dep. 9:14-10:3. Sanders has further shown, through the testimony of his cardiologist and Dr.

17

Trangle, that his use of beta blockers can affect the results of a Bruce protocol test, rendering them unreliable. *Id.* at 26:6-13. Union Pacific nevertheless chose to rely on this unreliable test result. A truly reasonable and individualized assessment, then, at a minimum would have included consideration of the impact beta blockers might have had on his treadmill test, Sanders's explanation about his knee preventing him from completing the test, the notation stating that the test was "inconclusive," a call to Sanders's doctors to clear up any concerns or ambiguities Union Pacific believed existed, and the inevitable resulting conclusion that the test was inconclusive rather than evidence of a dangerous health condition.

Union Pacific's assessment included none of those things. Union Pacific admits it ignored Plaintiff's explanations. Pl.'s Trial Ex. 20, at 1. Union Pacific did not follow up with Sanders's cardiologist or with the office that performed the treadmill stress test. Union Pacific admits it ignored Sanders's treating physician's return-to-work note. *See, e.g.*, ECF No. 82, at 5 ("Because the restrictions imposed by Dr. Charbonneau were more restrictive… there was no need to determining [sic] if [the treating physician's] restrictions prevented him from doing his job."). Rather than sort out Sanders's actual medical condition, Union Pacific insisted on its own unreasonable and erroneous interpretation of Sanders's medical records and clung to a single cursory notation as to why his test was stopped, even in the face of all the contrary evidence. Union Pacific did so without even consulting a cardiologist—much less Sanders's treating cardiologist.

Notably, it doesn't matter whether Union Pacific actually believed Sanders posed a threat in the workplace. "A subjective belief in the existence of a risk, even one made in good faith, will not shield the decisionmaker from liability." *Id.* (*citing Bragdon v. Abbott,* 524 U.S. 624 (1998)). Here, though, Union Pacific's erroneous assessment of Sanders's medical condition was not just shown to be unreasonable; it was shown to be in bad faith. By crediting and misinterpreting a

18

cursory notation by a technician while refusing to follow up on Sanders's more nuanced and detailed explanation for his treadmill-test results (an explanation which Sanders's other medical records supported, had Dr. Charbonneau bothered to fully evaluate them), Union Pacific was not relying on the best available medical evidence. Nor did it perform an individualized assessment of the risks posed by Sanders's purported heart condition. That would have involved, at minimum, further investigation into Sanders's explanation about his knee. Instead, Union Pacific obstinately insisted on requiring a particular Bruce protocol result—a result rendered impossible due to Sanders's individual circumstances.

Moreover, even assuming arguendo that Sanders had a heart problem (and he didn't), Union Pacific has presented no evidence that Sanders's health actually posed a significant risk of substantial harm to the health or safety of himself or others. Sanders did not drive trains. In his role as a foreman general, he oversaw others. He rarely engaged in manual labor of any kind. There is no evidence that Sanders posed a threat to anyone.

Sanders, by contrast, has shown, through his records, his own testimony, the testimony of his treating physician, and the testimony of his treating cardiologist, that his heart was healthy, that his health condition posed no meaningful risk of harm to him or his coworkers, and that even assuming arguendo that a small risk existed, it could have been avoided through a reasonable accommodation (as noted in the sections above and incorporated by reference here).

Thus, the evidence overwhelmingly shows that Sanders wasn't a direct threat, that Union Pacific's assessment was completely unreasonable and was not individualized, and that, at any rate, any purported risk could be accommodated. Sanders is thus entitled to judgment as a matter of law on Union Pacific's direct-threat defense, as no jury could find in Union Pacific's favor.

IV.    **Sanders Is Entitled to Judgment as a Matter of Law on Union Pacific's Business-Necessity Defense.**

Sanders is entitled to judgment as a matter of law on Union Pacific's business-necessity defense. No reasonable jury would have a sufficient evidentiary basis to find that Union Pacific had proven this defense with regard to either Sanders's disparate-treatment or his reasonable-accommodation claim.

To establish this defense, Union Pacific must show that the qualification standards, selection criteria, tests, or policies that it applied to Sanders to justify prohibiting him from returning to work are: (1) uniformly applied; (2) job-related for Sanders's position; (3) consistent with business necessity; and (4) cannot be met by a person with the plaintiff's disability even with a reasonable accommodation. *See* 42 U.S.C. §§ 12112(b)(6), 12113(a). To show "job-relatedness," an employer must demonstrate that the qualification standards, tests, selection criteria or policies fairly and accurately measure the employee's actual ability to perform the essential functions of the job. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 996 (9th Cir. 2007) (en banc). To show that the qualification standards, tests, selection criteria, or policies are "consistent with business necessity," the employer must show that they are vital to the employer's business. *Wright v. Ill. Dep't of Children and Family Servs.*, 798 F.3d 513, 523 (7th Cir. 2015).

Union Pacific has failed to carry its burden under this defense. As an initial matter, Union Pacific has not produced evidence that the defense even applies to the facts of this case. The defense is inapposite here because the discrimination does not involve the application of qualification standards, tests, selection criteria, or policies that have the effect of screening out or otherwise denying a job or benefit to disabled individuals, and because business necessity is not a defense to disparate-treatment and failure-to-accommodate claims. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 52–54 (2003) (distinguishing between disparate-treatment and disparate-

20

impact claims and indicating that business necessity is a defense only to the latter); *see also Roberts v. City of Chic.*, 817 F.3d 561, 566 (7th Cir. 2016); 29 C.F.R. §§ 1630.7, 1630.10(a), 1630.15(b)-(c). *But see Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946, 951 (8th Cir. 1999) (appearing to treat business-necessity as a defense to all claims of discrimination of ADA).

The only arguable qualification standard, test, or policy at issue here is Union Pacific's requirement of a satisfactorily completed treadmill stress test. Even assuming this counts as a "qualification standard" or test that has the effect of screening out disabled people, Union Pacific has not presented sufficient evidence that this standard is uniformly applied. Union Pacific only requires disabled people to pass this test.

The Bruce protocol test that Union Pacific insisted that Sanders take also did not accurately measure his ability to do his job. Union Pacific has not presented evidence that it is job-related; nothing in Sanders's job required him to run or walk up hills at a brisk pace, which is what the treadmill test involves. Moreover, Sanders provided a perfectly reasonable explanation for why he did not complete the test—an explanation that had nothing to do with Union Pacific's purported job-related concerns. Accordingly, the treadmill stress test was not a fair and accurate measurement of Sanders's ability to perform the functions of his job. *See Bates*, 511 F.3d at 996.

Union Pacific has not presented evidence that the test is consistent with business necessity, either. It is far from vital to Union Pacific's business. *See Wright*, 798 F.3d at 523. The test that Union Pacific required Sanders to perform didn't accurately measure his ability to do his job, so there was no need for it. Union Pacific has not shown that other tests of Sanders's cardiovascular function (like a bicycle test or the other stress test he had actually completed) were insufficient to demonstrate his ability to perform the essential functions of the position. Moreover, the test results do not support the restrictions that Union Pacific imposed on Sanders. Indeed, Sanders presented

overwhelming evidence both that the restrictions weren't warranted *and* that they didn't inhibit his ability to do the essential functions of his job, as he has argued above. There is just no evidence to support the proposition that Union Pacific's actions were necessary for its business.

Finally, as Sanders has argued above, Union Pacific could have reasonably—and easily—accommodated him. He could have been accommodated in several ways, including by entirely waiving the requirement of doing the Bruce protocol treadmill test and looking to other tests of his cardiovascular function, by job restructuring, or by mitigating any temperature- or weather-related concerns. Union Pacific has failed to prove that it could not accommodate him.

Sanders is entitled to judgment as a matter of law on Union Pacific's business-necessity defense. The defense fails on every point.

## V.   Sanders Is Entitled to Judgment as a Matter of Law on Union Pacific's Good-Faith Defense.

Sanders is entitled to judgment as a matter of law on Union Pacific's good-faith defense. No reasonable jury would have a sufficient evidentiary basis to find that Union Pacific had proven this defense.

The statutory good-faith defense is a defense only to compensatory and punitive damages for reasonable-accommodation claims. *See* 42 U.S.C. § 1981a(3). To prove that defense, Union Pacific must show that it made "good-faith efforts, in consultation with [Sanders], to identify and make a reasonable accommodation." *Id.* The evidence shows that Union Pacific did not make any such efforts.

Union Pacific refused, in bad faith, to have any meaningful discussion with Sanders about accommodations. Sanders repeatedly reached out to Union Pacific about what was needed for him to return to work. Due to a lack of response from Union Pacific, the process stalled. *See, e.g.*, Pl's Trial Ex. 4. Union Pacific also told Sanders that it could not accommodate him before he had even

had the opportunity to request any specific accommodation. Pl's Trial Exs. 15, 16, 17, 19, 23; Pl.'s Trial Ex. 20, at 2. As explained above, even though his quest for an accommodation seemed futile, Sanders nevertheless persisted in pursuing the interactive process and seeking an accommodation—specifically, a waiver of the unfair and unnecessary treadmill test requirement. In response, Union Pacific did *not* make "good-faith efforts, in consultation with" Sanders, to identify and make a reasonable accommodation. Instead, Dr. Charbonneau told Sanders he was lying about stopping the test because of his knee. Pl.'s Trial Ex. 20, at 1-2. Union Pacific refused to even consider waiving the test requirement because of Sanders's knee. *Id.* It told him, in decisive terms, that the only way he would ever return to work was if he provided a successful result from a treadmill test. *Id.* As explained above, this demonstrates bad faith on the part of Union Pacific, and it most definitely does not satisfy the requirement that it make good faith efforts "in consultation with" Sanders to identify an accommodation. *See* 42 U.S.C. § 1981a(3).

The evidence also shows that Union Pacific's statement that it could not accommodate Sanders was incorrect: Union Pacific could have easily accommodated him. First, as argued above, the evidence showed that the medical restrictions that Union Pacific imposed were baseless. Union Pacific should have waived these restrictions, and it should have waived its requirement that Sanders complete a treadmill test, given his knee issues and the availability of other tests. Second, the evidence also showed that General Superintendent Daniel Torres incorrectly determined Sanders could not perform the essential functions of his job with these baseless medical restrictions in place. *See* Pl's Trial Ex. 16. There was no need for the restrictions, and *even with* the restrictions, Sanders could have been accommodated, as he argued above. Union Pacific did not provide Torres and other managers with training on what companies must consider when determining whether a disability should be accommodated, and Torres never worked with Sanders or even talked to

Sanders about Sanders's job. This, too, means that Union Pacific cannot prove it made good-faith efforts to identify a reasonable accommodation.

On these facts, no reasonable jury could find that Union Pacific made good-faith efforts, in consultation with Sanders, to identify and make a reasonable accommodation. Indeed, the evidence shows just the opposite: Union Pacific made absolutely no efforts either to understand Sanders's medical conditions or to accommodate him. Any reasonable jury would find that Union Pacific focused its efforts not on finding accommodations, but on finding excuses to keep Sanders from returning to work.

## VI.   Sanders Is Entitled to Judgment as a Matter of Law on His Claim for Compensatory Damages.

Sanders is entitled to judgment as a matter of law on his claim for compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses. No reasonable jury would have a sufficient evidentiary basis to find that Sanders is not entitled to the full amount of damages for his injuries permissible under the ADA. Those damages are capped at $300,000 under the ADA. *See* 42 U.S.C § 1981a(b)(3)(D).

Sanders presented substantial evidence that he suffered emotional distress and other injuries as a result of Union Pacific's violation of his rights. *See Thomas v. Athlete's Foot*, 2014 WL 2050856, at *3 (E.D. Mich. May 17, 2014) (holding that plaintiff was entitled to compensatory damages in employment-discrimination case).

Sanders described the pain and stress of losing his position and his career with Union Pacific. He explained how losing his job hurt his feelings and left him angry and anxious. Sanders's pain and suffering was a direct result of Union Pacific's unlawful conduct, entitling Sanders to full damages of $300,000 as a matter of law.

**VII.    Sanders Is Entitled to Judgment as a Matter of Law on His Claim for Punitive Damages.**

Sanders is entitled to judgment as a matter of law on his claim for punitive damages. No reasonable jury would have a sufficient evidentiary basis to find that Sanders is not entitled to the full amount of punitive damages permissible under the ADA. Those damages are capped at $300,000 under the ADA. *See* 42 U.S.C § 1981a(b)(3)(D).

To show that he is entitled to punitive damages, Sanders must prove that Union Pacific engaged in intentional discrimination "with malice or with reckless indifference to his federally protected rights." 42 U.S.C. § 1981a(b)(1). An employer acts with "malice and reckless indifference" if it acts with knowledge that its action may violate the law. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). Sanders has made that showing here.

To satisfy this standard, plaintiffs in typical discrimination cases must first demonstrate two things by a preponderance of the evidence: 1) that the relevant actors acted with the "requisite mental state" (malice or recklessness); and 2) a "basis for imputing liability" to the employer. *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857-58 (7th Cir. 2001). The burden then shifts to the employer to show that liability is not properly imputed to it because its "good faith efforts to comply with" the ADA "mak[e] it inappropriate to punish the employer for its employees' contravention of its established policies." *Id.* at 858-59.

But this is a direct-liability—not a vicarious-liability—case. And in direct-liability cases, "the good-faith defense does not apply." *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1271 (10th Cir. 2000); *Miller v. Rockford Register Star*, No. 98 C 50139, 2001 WL 637575, at *5 (N.D. Ill. June 8, 2001) (same); *Bruso*, 239 F.3d at 860 n.8 (same in dicta); *Cooke v. Stefani Mgmt. Servs., Inc.*, 250 F.3d 564, 569 (7th Cir. 2001) (in direct-liability cases, "the supervisor acts on behalf of the company in enforcing (or failing to enforce) its sexual harassment policy, and it is

25

therefore fair to attribute his knowledge and acts to the company"). And to the extent that Sanders was required to show a "basis for imputing liability" to his employer, he has done so. *Bruso*, 239 F.3d at 857-58. Union Pacific's unlawful actions came from its medical director, assistant medical director, and various high-ranking managers. All of these actions are imputable to Union Pacific as a matter of law.

Sanders has also established the requisite mental state of recklessness. This requires proof that Union Pacific "acted with knowledge that its action *may have* violated federal law." *Id.* at 857 (citing *Kolstad*, 527 U.S. at 535) (emphasis added). Union Pacific "need not be aware that it is engaging in discrimination." *Id.* Instead, a plaintiff need prove only that the defendant acted "in the face of a perceived risk that its actions will violate federal law." *Id.* (citing *Kolstad*, 527 U.S. at 536). "A plaintiff may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the antidiscrimination laws." *Id.* at 858.

The evidence presented at trial satisfies this standard by a mile. Union Pacific, a sophisticated employer, had an anti-discrimination policy that reflected its understanding of the ADA's anti-discrimination provisions. Def.'s Trial Ex. 128. Union Pacific says that it expects all of its employees to be familiar with this policy. *Id.* at 3. Union Pacific's management was thus aware of the relevant anti-discrimination laws.

The jury also heard evidence that Union Pacific plainly violated the ADA despite its awareness of the law's requirements. First, the evidence is overwhelming that Union Pacific refused to let Sanders return to work on the basis of his disability even though there was no medical or safety-related reason for making that decision. The jury heard evidence that Dr. Charbonneau knew that Sanders's doctors had released him to return to work with no restrictions. *See* Pl's Tr. Exs. 1-3, 20. And it also heard evidence that all of Sanders's medical conditions had been resolved

to Union Pacific's satisfaction, other than his supposed heart problem and low aerobic capacity. But that should have been resolved, too, because Union Pacific egregiously misinterpreted the test that it believed showed those things—and it remained unyieldingly committed to that misinterpretation in the face of loads of contrary evidence. Dr. Charbonneau is not a cardiologist and didn't speak to a cardiologist about Sanders. In fact, he didn't talk to any of Sanders's doctors or even, initially, to Sanders himself. He only spoke with Sanders after Sanders insisted on interacting. Then, Dr. Charbonneau refused to believe Sanders that the test in question had been stopped because of his knees. Worse yet for Union Pacific, the evidence shows that it didn't consider any of Sanders's other test results—which showed that his heart was fine—or consider any other tests, like the bicycle stress test. Instead, even after Sanders gave a detailed explanation as to why he could not complete the treadmill test, Union Pacific obstinately and recklessly continued to insist that he do so. As Dr. Trangle testified, Union Pacific's process was shameful. Any reasonable, non-reckless individual in Dr. Charbonneau's position would have considered the information Sanders provided and would have made a good-faith effort to follow up on it or to find a test that Sanders could complete despite his knee. Indeed, Dr. Charbonneau's actions don't even comport with the relevant medical standard of care, especially since he wasn't even a cardiologist. The restrictions that Union Pacific imposed, which led to Sanders's effective termination, simply had no medical or safety-related basis. What they were based on was disability discrimination.

Sanders likewise showed that Union Pacific never even considered accommodating his disability. In fact, it told him that he could not be accommodated, yet Torres, the manager who made that decision, did not work with Sanders or even speak with him about his job. A reasonable jury could find—and could only find—that by delegating the accommodations decision to a

27

manager with no knowledge of Sanders's actual job duties or of an employer's duty to accommodate under the ADA, Union Pacific recklessly disregarded Sanders's rights under the ADA, entitling Sanders to punitive damages as a matter of law. The evidence of Union Pacific's financial condition, which clearly demonstrates its financial ability to consult with actual cardiologists and to provide more robust training to managers like Torres, further bolsters this conclusion. *See* Jury Inst. on Punitive Damages.

Even if the good-faith defense to punitive damages has any place in this case (and Sanders asserts that it does not on these facts), the record is clear that Union Pacific did not make good-faith efforts to comply with the ADA. As stated above, Union Pacific simply made no attempt to comply with the ADA. It paid no attention to what Sanders said about his test results, insisting without any evidence that they meant he had heart problems. It ignored Sanders's alternative explanation and in fact accused him of lying based solely on a cursory note likely written by a technician. It paid no attention to what his job responsibilities actually were and whether he could be accommodated in them. And, it didn't train its managers on what to consider when determining whether to grant an accommodation. *Kolstad*'s good-faith defense requires far more than this. *See* 527 U.S. 526; *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 385 (2d Cir. 2001) ("This defense requires an employer to establish both that it had an antidiscrimination policy and made good faith effort to enforce it.").

Sanders is entitled to judgment as a matter of law on his claim for punitive damages in the full amount permissible under the ADA.

## VIII.   Sanders Is Entitled to Judgment as a Matter of Law on His Claim for Back Pay.

Sanders is entitled to judgment as a matter of law on his claim for back pay.

The ADA incorporates Title VII's remedial provisions, including those involving back pay. *See* 42 U.S.C. § 12117(a); *Doane v. City of Omaha*, 115 F.3d 624, 629 (8th Cir. 1997). "A person who has been discriminated against is entitled to the most complete relief possible, and there is a strong presumption that persons who have been discriminated against are entitled to back pay." *Doane*, 115 F.3d at 629. "Back pay represents the wages [and other benefits] the plaintiff would have earned had [he] not been fired," *Ortega v. Chicago Bd. of Educ.*, 280 F. Supp. 3d 1072, 1078 (N.D. Ill. 2017), minus "interim earnings" the plaintiff would not have otherwise received. *See* 42 U.S.C. § 2000e-5(g)(1).

Sanders is entitled to back pay as a matter of law here. The jury received evidence of Sanders's wages and benefits and of the wages and benefits Sanders would have received had Union Pacific not effectively terminated him. *See* Pl's Trial Ex. 8; Initial Jury Instr. No. 12 (Uncontroverted Facts). Sanders has been deprived of wages for nearly three and a half years, and he has been deprived of benefits for a little over a year. The average yearly income of the three employees above and below Sanders on the seniority roster has been a little over $90,000. Initial Jury Instr. No. 12 (Uncontroverted Facts), ¶¶ 11-15. Union Pacific would have contributed nearly $18,000 per year to Sanders's pension for each year, and the yearly value of Sanders benefits is a little over $20,000. *Id.* Taken together, Sanders is entitled to roughly $400,000.

Union Pacific has not proven that Sanders failed to mitigate his damages. "The burden is on the defendant to prove failure to mitigate damages." *Coleman v. City of Omaha*, 714 F.2d 804, 808 (8th Cir. 1983). "The defendant has to show that the plaintiff failed to use reasonable care and diligence and that there were jobs available which the plaintiff could have discovered and for which the plaintiff was qualified." *Id.* The plaintiff, however, need not accept every opportunity. The plaintiff only must accept substantially equivalent positions that "afford the plaintiff virtually

identical promotional opportunities, compensation, job responsibilities, working conditions, and status." *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983). "Thus, two employment positions cannot be considered substantially equivalent unless they are virtually identical in terms of compensation." *E.E.O.C. v. Molle Chevrolet, Inc.*, No. CIV.A.91-0030-CV-WBB, 1992 WL 443562, at *6 (W.D. Mo. Dec. 22, 1992).

Union Pacific has not carried its burden in proving that Sanders failed to mitigate his damages. At trial, Sanders testified that he did not apply for other jobs within the company because he would have had to forfeit his seniority, which is unwise for someone who is seeking to be reinstated through litigation, and that he did not apply for jobs outside the company because he would have had to forfeit railroad retirement benefits he would have earned. Under the circumstances, it was not only reasonable but also the best course of action for Sanders to do what he did—apply for retirement.

Taken together, it cannot be seriously argued that Union Pacific has proven that Sanders failed to mitigate his damages. He is therefore entitled to judgment as a matter of law on his claim for back pay.

## IX.   Sanders Is Entitled to Judgment as a Matter of Law on His Claim for Reinstatement or Front Pay in Lieu of Reinstatement.

Sanders is entitled to judgment as a matter of law on his claim for reinstatement or front pay in lieu of reinstatement. No reasonable jury would have a sufficient evidentiary basis to find in Union Pacific's favor on this issue.

The relief available under the ADA includes reinstatement and front pay in lieu of reinstatement. *See* 42 U.S.C. § 2000e-5(g)(1); *Fiedler v. Nebraska*, No. 4:08CV3144, 2010 WL 11526885, at *1 (D. Neb. Oct. 15, 2010). "Front pay consists of monetary damages that may be awarded in lieu of reinstatement in situations where reinstatement is 'impracticable or

impossible.'" *Newhouse v. McCormick & Co., Inc.*, 110 F.3d 635, 641 (8th Cir. 1997). Front pay is "designed to put [the employee] in the identical financial position that he would have occupied had he been reinstated." *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1231 (7th Cir. 1995). When determining what amount should be awarded for front pay, courts consider "the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate." *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992).

First, because Sanders is qualified to do his job and because Union Pacific violated the ADA in effectively terminating him (as the evidence shows and as Sanders argued above), Sanders is entitled to be reinstated to his job or an equivalent one. *See Rashad v. Fulton Cnty.*, 2010 WL 11500036, at *8-9 (N.D. Ga. Jan. 5, 2010) (finding wrongfully discharged employee was entitled to reinstatement).

Second, Union Pacific has failed to establish that his job would have ended and that he would have been terminated because the foreman general position was subsequently eliminated. Although Union Pacific's witnesses claim that the particular foreman general position Sanders held was eliminated, it is not at all clear that that would have happened if Sanders had still been in the position. And in any event, Union Pacific would have had to transfer Sanders to a different position in its large workforce given his seniority and union protections.

In the alternative, Sanders is entitled to front pay in lieu of reinstatement. Sanders testified that he intended to work until he would be 70 years old, and there is no evidence demonstrating that he could not have so done. Given the rates and values stated above in the section on back pay, if Sanders is not reinstated, he is entitled as a matter of law to his full future wage and benefit loss.

31

## <u>CONCLUSION</u>

For the foregoing reasons, Sanders's motion for judgment as a matter of law should be granted.

Dated: February 17, 2022                s/ Adam W. Hansen
                                             Adam W. Hansen
                                             Bar Number: MN # 0391704
         Email: adam@apollo-law.com
         Eleanor Frisch
         Email: eleanor@apollo-law.com
         APOLLO LAW LLC
         333 Washington Avenue North
         Suite 300
         Minneapolis, MN 55401
         Telephone: (612) 927-2969

         Colin R. Reeves
         APOLLO LAW LLC
         1314 Pacific Street
         Brooklyn, NY 11216
         Telephone: (646) 363-6763
         Email: colin@apollo-law.com

         Nicholas D. Thompson
         Casey Jones Law LLC
         3520 Cherryvale Avenue, Suite 83
         Appleton, WI 54913
         Telephone: (757) 477-0991
         Email: nthompson@caseyjoneslaw.com

         *Attorneys for Plaintiff Allan Sanders*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with NECivR 7.1(d)(3) and further certify that the word count function was applied to include all text, including the caption, headings, footnotes, and quotations. This document was prepared using Microsoft for Office 365 and contains 9,924 words.

<u>s/ Adam W. Hansen</u>
Adam W. Hansen

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 17, 2022, I filed the foregoing electronically through the CM/ECF system, which served all counsel of record.

<u>s/ Adam W. Hansen</u>
Adam W. Hansen